**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

YVETTE FELARCA; JOSHUA
ANDERSON; CHRISTOPHER
ANDERSON; HONEST CHUNG;
MORGAN CRAWFORD; YANIA
ESCOBAR; JOSEPH FINTON; LOUIS
HELM; JACQUELYN KINGKADE;
BENJAMIN LYNCH; LIANA
MULHOLLAND; COLLEEN MICA
STUMPF; JUSTIN TOMBOLESI; ERICK
URIBE; COLLEEN YOUNG; ANTHONY
MORREALE; SACHINTHYA
WAGAARACHCHI; FRANCISCO
ALVARADO-ROSAS; JULIE KLINGER;
MAXIMILIAN MCDONALD; TARO
YAMAGUCHI-PHILLIPS,
          *Plaintiffs-Appellees*,

v.

ROBERT J. BIRGENEAU, Chancellor of
the University of California-
Berkeley, in his individual capacity;
GEORGE BRESLAUER, Executive Vice
Chancellor and Provost of the
University of California-Berkeley, in
his individual capacity; HARRY LE
GRANDE, Vice Chancellor for
Student Affairs of the University of
California-Berkeley, in his individual

No. 16-15293

D.C. No.
4:11-cv-05719-
YGR

capacity; LINDA WILLIAMS,
Associate Chancellor of the
University of California-Berkeley, in
her individual capacity; CLAIRE
HOLMES, Associate Vice Chancellor
for Public Affairs and
Communications for the University
of California-Berkeley, in her
individual capacity; MITCHELL
CELAYA, Chief of the University of
California Police Department at
Berkeley, in his individual capacity;
ERIC TEJADA, Lieutenant; MARC
DECOULODE, Lieutenant; ANDREW
TUCKER, Sergeant #13, a police
officer for the University of
California Police Dept., in his
individual capacity,
                 *Defendants-Appellants*,

                 and

SAMANTHA LACHLER,
                      *Defendant*.

YVETTE FELARCA; JOSHUA
ANDERSON; CHRISTOPHER
ANDERSON; HONEST CHUNG;
MORGAN CRAWFORD; YANIA
ESCOBAR; JOSEPH FINTON; LOUIS
HELM; JACQUELYN KINGKADE;
BENJAMIN LYNCH; LIANA
MULHOLLAND; COLLEEN MICA
STUMPF; JUSTIN TOMBOLESI; ERICK
URIBE; COLLEEN YOUNG; ANTHONY
MORREALE; SACHINTHYA
WAGAARACHCHI; FRANCISCO
ALVARADO-ROSAS; JULIE KLINGER;
MAXIMILIAN MCDONALD; TARO
YAMAGUCHI-PHILLIPS,
              *Plaintiffs-Appellees*,

            v.

SAMANTHA LACHLER,
            *Defendant-Appellant*,

           and

ROBERT J. BIRGENEAU, Chancellor of
the University of California-
Berkeley, in his individual capacity;
GEORGE BRESLAUER, Executive Vice
Chancellor and Provost of the
University of California-Berkeley, in
his individual capacity; HARRY LE
GRANDE, Vice Chancellor for
Student Affairs of the University of
California-Berkeley, in his individual

No. 16-15294

D.C. No.
4:11-cv-05719-
YGR

OPINION

capacity; LINDA WILLIAMS,
Associate Chancellor of the
University of California-Berkeley, in
her individual capacity; CLAIRE
HOLMES, Associate Vice Chancellor
for Public Affairs and
Communications for the University
of California-Berkeley, in her
individual capacity; MITCHELL
CELAYA, Chief of the University of
California Police Department at
Berkeley, in his individual capacity;
ERIC TEJADA, Lieutenant; MARC
DECOULODE, Lieutenant; ANDREW
TUCKER, Sergeant #13, a police
officer for the University of
California Police Dept., in his
individual capacity,

*Defendants.*

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted September 13, 2017
San Francisco, California

Filed May 31, 2018

Before:  J. Clifford Wallace and Paul J. Watford, Circuit
Judges, and W. Louis Sands,[*] District Judge.

Opinion by Judge Wallace;
Concurrence by Judge Watford

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's order, on summary judgment, denying qualified immunity to University of California officials for the use of batons against protesters by University police officers.

Addressing first the claims of direct excessive force brought by plaintiffs against Officer Lachler and Sergeant Tucker, the panel noted that none of the plaintiffs who brought these claims suffered injuries from defendants' blows that required medical treatment or kept them from returning to the protest. Thus, the panel concluded that, even if the force used was of a type that is generally intrusive, the amount of force applied here was minimal.  The panel held that the government had a legitimate interest in applying minimal force to maintain order and enforce University policy.  On balance, the panel concluded that Officer Lachler and Sergeant Tucker did not use excessive force, and reversed the district court's summary judgment and

---

[*] The Honorable W. Louis Sands, United States District Judge for the Middle District of Georgia, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

remanded for the district court to grant summary judgment in their favor.

The panel next addressed plaintiffs' claims that the supervisory defendants planned the police response and failed to stop assaults by the police. The panel held that the district court erred by denying summary judgment to Vice Chancellor Le Grande, Associate Chancellor Williams, and Associate Vice Chancellor Holmes, who were not in the police chain of command, and had no supervisory authority over the police who allegedly committed the violations. The panel then held that Chancellor Birgeneau, Executive Vice Chancellor Breslauer, and Police Chief Celaya, who were in the police chain of command, did not have sufficient personal involvement in the alleged acts of force. The panel held that summary judgment should have been granted by the district court on these claims, and the panel reversed and remanded for the district court to do so.

Addressing supervisory force claims against University of California Police Lieutenant DeCoulode and Sergeant Tucker, the panel noted that a number of the plaintiffs had failed to identify the police officers who used excessive force against them and failed to show that these unnamed officers were among those in Lieutenant DeCoulode or Sergeant Tucker's chain of command. Nor had these plaintiffs provided evidence that Lieutenant DeCoulode or Sergeant Tucker ordered or failed to stop any action that they knew or reasonably should have known would cause the officer to use excessive force.

As to the supervisory force claims brought by plaintiffs that had identified the subordinate officers, the panel held that even assuming, without deciding, that the named subordinate officers used excessive force against each plaintiff, plaintiffs had not met their required burden to show

the law was clearly established at the time that the officers' baton strikes violated their constitutional rights. Because plaintiffs had not shown a violation of a clearly established right, it necessarily followed that Lieutenant DeCoulode and Sergeant Tucker could not have violated a clearly established right by supervising the officers who allegedly used force against plaintiffs.

Concurring, Judge Watford joined all but section III of the court's opinion. In his view, the officers used excessive force when they struck plaintiffs with batons solely for the purpose of dispersing the crowd. Nonetheless, he believed that the officers were entitled to qualified immunity because the law at the time they acted did not clearly establish the illegality of their conduct. He would rule for the defendants on the direct force claims solely on that basis.

---

## COUNSEL

J. Daniel Sharp (argued) and Rebecca M. Suarez, Crowell & Moring LLP, San Francisco, California; Colin M. Proksel, Crowell & Moring LLP, Irvine, California; Russell M. Perry (argued) and Zachery A. Lopes, Rains Lucia Stern St. Phalle & Silver PC, Ontario, California; for Defendants-Appellants.

Shanta Driver (argued) and Ronald Cruz, United For Equality and Affirmative Action Legal Defense Fund, Detroit, Michigan, for Plaintiffs-Appellees.

**OPINION**

WALLACE, Circuit Judge:

University officials appeal from the denial of qualified immunity for the use of batons against protestors by university police officers. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand.

I.

Thousands of protestors, inspired by the Occupy Wall Street movement, held a rally at the University of California, Berkeley on November 9, 2011. The protestors planned in advance to construct an encampment during the rally in violation of university policy. Berkeley administrators became aware of the plan weeks before when protest organizers distributed flyers seeking tents and other camping supplies. Driven by a concern over the health and safety risks that might accompany a long-term encampment, a team of university administrators preemptively developed an operational plan to deal with the protests and asked campus police to be ready to enforce the university's existing no-camping policy. Two days before the rally, university administrators warned students in a campus-wide email that the no-camping policy would be enforced.

At noon on November 9, some protestors engaged in a peaceful rally without incident. A few hours later, however, the protestors erected tents. After reading a dispersal order to the protestors, police took the tents down when the protestors refused to do so. Soon, the protestors began setting up more tents in the same area. The police returned wearing riot gear. Many of the protestors formed a human chain to block officers from reaching the tents. Police gave several bullhorn warnings ordering the protestors to take

down the tents and disperse, although some protestors could not understand the warnings. When the warnings had no effect, officers then used their hands and batons to move the crowd, gain access to the tents, and maintain a perimeter while dismantling the encampment. Some protestors attempted to grab the officers' batons, shouted, and pushed against them. At least one protestor ended up in the hospital. Following the afternoon's events, university administrators tried to compromise with the protestors, agreeing to round-the-clock protests so long as the protestors did not set up encampments. The protestors rejected the offer, shouting profanities.

That evening police made a coordinated effort to take down additional tents protestors had set up. Police again gave bullhorn warnings to take down the tents and disperse, but again some protestors could not understand the warnings. When the protestors continued to block the police, the police again used their hands and batons to access and remove the tents. The police arrested at least thirty-six protestors throughout the day for obstructing the officers and resisting arrest. At least one more protestor ended up in the hospital following the evening's events.

Subsequent to the November 9 protests, some of the protestors filed the instant action against university administrators and police officers, alleging the officers used excessive force against them while removing the tents. Defendants moved for summary judgment on the ground of qualified immunity. The district court denied summary judgment motions by two University of California Police Department (UCPD) officers as to direct excessive force claims, and by five university administrators and three UCPD officers as to supervisory excessive force claims. In denying the motions, the district court concluded that triable

issues of fact existed as to the reasonableness of defendants' actions. Defendants appealed.

We review *de novo* the denial of a motion for summary judgment predicated on qualified immunity. *Sjurset v. Button*, 810 F.3d 609, 614 (9th Cir. 2015). Summary judgment is granted only when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* We view the evidence in the light most favorable to the nonmoving party. *Id.*

## II.

Qualified immunity protects public officials from a court action unless their conduct violated a constitutional right that was clearly established at the time. *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015). The relevant inquiry requires us to ask two questions: (1) whether the facts, taken in the light most favorable to the non-moving party, show that the officials' conduct violated a constitutional right, and (2) whether the law at the time of the challenged conduct clearly established that the conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A plaintiff must prove both steps of the inquiry to establish the officials are not entitled to immunity from the action. *Marsh v. County of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012). We may address the steps in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Under the first step of the analysis, police use of force violates the Fourth Amendment if it is objectively unreasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 388 (1989). We assess reasonableness by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted).

Under the second step, we consider whether the law was clearly established at the time of the challenged conduct. *Sjurset*, 810 F.3d at 615. The Supreme Court has repeatedly told courts "not to define clearly established law at a high level of generality." *Sheehan*, 135 S. Ct. at 1775–76. The law must have been clear enough that "*every* reasonable official" would know he or she was violating the plaintiff's rights. *Sjurset*, 810 F.3d at 615 (emphasis added), quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

## III.

We first examine the direct force claims. Plaintiffs C. Anderson and Crawford assert claims against Officer Lachler, and plaintiffs Uribe and J. Anderson assert claims against Sergeant Tucker. Each plaintiff admits linking arms with other students to block the officers' access to the tents.

C. Anderson alleged that Officer Lachler jabbed him in the back with the tip of her baton at least six times at the afternoon protest. C. Anderson did not leave the protest immediately after the alleged incident with Officer Lachler and returned for the evening protest. C. Anderson testified that he received the administration's email warning that tents were not permitted. He also heard dispersal orders and did not leave. He testified that he stayed in the front of the crowd intentionally because "he could physically withstand the blows."

Crawford alleged that Officer Lachler repeatedly jabbed him with her baton in the torso at the afternoon protest. Crawford left the protest to attend a pre-existing appointment and dinner at a friend's house, and then

returned for the evening protest. Crawford did not receive medical attention for any injuries from Officer Lachler. Crawford testified that while he could not hear whether the officer speaking through the bullhorn had given a dispersal order, he "didn't think that we'd been asked to leave the number of times required."

Uribe alleged that Sergeant Tucker pushed and hit him with Sergeant Tucker's baton, including with jab and overhand strikes to Uribe's body and hand. Uribe developed a welt on his hand, which he treated with ice at home. After an interview with a news organization about the events, he returned for the evening protest. Uribe testified that he heard dispersal orders, but never tried or even considered leaving the protest.

J. Anderson alleged that Sergeant Tucker caused him to "tumble to the ground" when Sergeant Tucker "knocked back" another protestor resulting in "a domino effect." He also alleged that Sergeant Tucker hit him "in the neck and face with [Sergeant Tucker's] baton three times." He experienced swelling in his face, but left the student health center without seeing a doctor to meet with friends and returned for the evening protest. J. Anderson testified that he heard dispersal orders and could have left the protest, but chose not to. He responded to police instructions to "Move, move!" with "I'm sorry sir, but I will not." He later posted on his blog a photograph from the rally captioned "[a]n officer gives the dispersal order - though we make him do it our way."

## A.

We turn to step one of the qualified immunity analysis. To evaluate the nature and quality of the intrusions on plaintiffs' Fourth Amendment interests, we consider the

"type and amount of force inflicted" against them. *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011). While baton blows are a type of force capable of causing serious injury, *id.* at 1162, jabs with a baton are less intrusive than overhand strikes. Defendants' expert opined that officers are trained that tip end jabbing, pushing, shift striking, and chopping are reasonable uses of force when individuals actively resist lawful orders. UCPD's crowd management policy permitted the use of batons "in a crowd control situation" "to move, separate, or disperse people," except to strike intentionally a prohibited area, such as the head, unless confronting deadly force.

Here, each plaintiff, except for J. Anderson, alleged that he was hit by a baton in the torso or extremities. C. Anderson and Crawford alleged only jab strikes by Officer Lachler. Uribe alleged jab and overhand strikes by Sergeant Tucker. While J. Anderson did not specify the type of strike Sergeant Tucker allegedly used against him, the portion of the video he points to shows Sergeant Tucker's baton brush across the top of his head. Later in the same video, Sergeant Tucker's baton appears to make contact with J. Anderson's face or head again before Sergeant Tucker falls backward onto the ground. In both cases, the force appears incidental to moving and tousling with the crowd.

We may also consider the severity of injuries in evaluating the amount of force used. *See Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002). We may infer from the minor nature of a plaintiff's injuries that the force applied was minimal. *See Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001). While injuries are not a precondition to section 1983 liability, their absence can suggest a lesser degree of force when that force is of the type likely to cause injuries. *See Santos*, 287 F.3d at 855, citing

*Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc). We would generally expect injuries from a forceful use of baton blows. *See Young*, 655 F.3d at 1162. But here, none of the plaintiffs suffered injuries from defendants' blows that required medical treatment or kept him from returning to the protest. Thus, we conclude that, even if the force used was of a type that is generally intrusive, the amount of force applied here was minimal.

On the other side, when evaluating the government's interest, we may consider such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. We may also consider the availability of less intrusive alternatives to the force employed and whether warnings were given. *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). Of these factors, the most important is whether the suspect posed an immediate threat to the safety of the officers or others. *Id.*

Here, the government's interest began with an attempt by the police to remove the protestors' tents. While the tents themselves posed no threat and the protestors appeared guilty only of misdemeanors, the university was not required to permit the "organized lawlessness" conducted by the protestors. *See Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). The university had a legitimate interest in "quickly dispersing and removing [the] lawbreakers with the least risk of injury to police and others." *Id.* Similar to *Jackson*, in which we held the government had a "safety interest in controlling" a mass of people, the protestors here "substantially outnumbered" officers, "refused to obey the officers' commands to disperse," "shouted at the officers," and "engaged the officers in verbal and physical

altercations." 268 F.3d at 652–53. University officials offered to compromise, but protestors rejected the offer. The protestors also ignored warnings by police and university officials before and during the protest. Like *Jackson*, it is undisputed that these four plaintiffs in particular understood police had ordered them to disperse, ignored or dismissed those orders, and instead directly interfered with officers' attempt to enforce university policy by linking arms to block officers' access to the tents. *See id.* at 653. Under these circumstances, the government had a legitimate interest in applying minimal force to maintain order and enforce university policy.

Uribe, the only plaintiff alleging an overhand strike by either defendant, took the interference a step further. Plaintiffs' videos show Uribe pushing and kicking at Sergeant Tucker and another officer, grabbing the officers' batons, shaking his fist at officers, and throwing leaves from a nearby bush into officers' faces. While the district court found that some of Uribe's actions may have been defensive, Uribe's throwing leaves and shaking his fist – actions he admitted doing – were unequivocally attempts at provocation.

Plaintiffs rely on *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011) and *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) to support their argument that the officers acted unreasonably. We are not persuaded. In *Young*, an officer sprayed a driver with pepper spray from behind, while the driver sat on a curb eating broccoli after refusing to return to his vehicle, and later hit the driver with a baton while he "lay face-first" on the ground. 655 F.3d at 1158–59, 1164. In *Headwaters*, the officers applied pepper spray with Q-tips to the eyes of protestors "sitting peacefully" while chained

together with self-releasing metal sleeves that rendered them immobile, after they refused to leave the protest site. 276 F.3d at 1127–30. When *Young* and *Headwaters* are viewed together, two important distinctions emerge. First, unlike the plaintiffs in *Young* and *Headwaters* who restricted their *own* movement by refusing to comply with police orders, the protestors here purposefully restricted the *officers*' movement by refusing to let them pass. Second, the situation confronting the officers here was far more threatening because they were greatly outnumbered and verbally and physically provoked. *See Jackson*, 268 F.3d at 652–53. While we are careful not to attribute other protestors' actions to those plaintiffs who do not admit physically provoking police, "the context of the officers' actions must be considered." *Nelson v. City of Davis*, 685 F.3d 867, 886 (9th Cir. 2012).

On balance, applying the *Graham* analysis, we conclude that Sergeant Tucker and Officer Lachler did not use excessive force against these four plaintiffs. The officers were entitled to use the minimal force they did to move the crowd in order to gain access to the tents erected in violation of university policy. Given that no Fourth Amendment violation occurred, we need not reach the second step of the qualified immunity analysis. We reverse and remand for the district court to grant summary judgment in favor of Sergeant Tucker and Officer Lachler.

## IV.

We now turn to the supervisory force claims. Five university administrators, Chancellor Birgeneau, Executive Vice Chancellor Breslauer, Vice Chancellor Le Grande, Associate Chancellor Williams, and Associate Vice Chancellor Holmes, and one UCPD police officer, Police Chief Celaya (collectively, the UC administrators) appeal

from the denial of summary judgment on supervisory claims by twenty-one plaintiffs. Two UCPD officers, Lieutenant DeCoulode and Sergeant Tucker, appeal from the denial of summary judgment on supervisory claims by thirteen plaintiffs. Plaintiffs allege that the supervisory defendants planned the police response and failed to stop assaults by the police.

## V.

We consider first the UC administrators. The UC administrators developed an operational plan for dealing with the protests weeks before they took place. The plan did not specify any particular use of force that would be permitted in enforcing removal of tents that were erected. The plan stated as its goals "protect[ing] the safety" of all parties, "prevent[ing] violence, damage and other criminal activity," and "achieving specific public safety and law enforcements [sic] objectives that arise with only that use of force that is necessary and reasonable." It specifically provided that pepper spray should not be used as a first effort to disperse a crowd and tear gas should be used only in extreme circumstances.

Chancellor Birgeneau, Executive Vice Chancellor Breslauer, and Police Chief Celaya were in the police chain of command. Each testified he did not direct any police officer to use force, or to use any particular level or type of force in removing the tents.

Chancellor Birgeneau was travelling overseas on university business when the protests occurred. He received regular updates on the protests by email. He reaffirmed his support of the university's no-camping policy, telling Executive Vice Chancellor Breslauer that it was "critical that we do not back down on our no encampment [sic] policy." He

was aware by the late afternoon that police had used batons at the afternoon protest.

Executive Vice Chancellor Breslauer observed parts of the afternoon protest but did not see police using batons. He was aware by the late afternoon that police had used batons to access the tents and protestors had been injured.

Police Chief Celaya was in contact with the police commander in charge, who was responsible for overseeing the operation. Celaya did not witness the afternoon protest. During the evening protest, he was on a balcony fifty yards away. It was dark. Although Celaya could hear an officer using a bullhorn, he could not see individual actions taken by particular officers. After midnight, he reported the day's events to the other UC administrators based in part on information received from the commander in charge.

Vice Chancellor Le Grande, Associate Chancellor Williams, and Associate Vice Chancellor Holmes were not in the police chain of command and did not have supervisory authority over any police officers.

## A.

An official may be liable as a supervisor only if either (1) he or she was personally involved in the constitutional deprivation, or (2) a sufficient causal connection exists "between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08, quoting *Redman v. County of San Diego*, 942 F.2d

1435, 1447 (9th Cir. 1991), and *Dubner v. City and County of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001) (internal alterations, citations, and quotation marks omitted). There is no respondeat superior liability under section 1983. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002), citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Officers may not be held liable merely for being present at the scene of a constitutional violation or for being a member of the same operational unit as a wrongdoer. *Id.* at 936–37.

## B.

We first consider Vice Chancellor Le Grande, Associate Chancellor Williams, and Associate Vice Chancellor Holmes, none of whom was in the police chain of command. Because these administrators had no supervisory authority over the police who allegedly committed the violations, they did not participate in or cause such violations. *See Starr*, 652 F.3d at 1207–08. They cannot be supervisors of persons beyond their control. *See Reid v. Kayye*, 885 F.2d 129, 132 (4th Cir. 1989) (holding defendants not liable under section 1983 on a theory of supervisory liability because state law "does not place [them] in a supervisory position"). Therefore, the district court erred in denying summary judgment to these three administrators.

## C.

We next consider the other UC administrators, Chancellor Birgeneau, Executive Vice Chancellor Breslauer, and Police Chief Celaya, each of whom was in the police chain of command. Viewing the facts in the light most favorable to plaintiffs, as we must, we assume these officials ordered police to remove the tents, acquiesced in the use of batons to effectuate removal of the tents, and learned that

batons had been used during the afternoon protest and injuries had occurred.

The question, then, is whether these facts show the degree of personal involvement or causal connection required by our precedents. *See Starr*, 652 F.3d at 1207. We hold that they do not. Plaintiffs' brief does not describe any specific instance of force against those plaintiffs alleging only supervisory claims. Although some submitted affidavits claiming that police officers used force against them, they have not connected the force applied by each officer to the actions of these administrators. Accordingly, they have failed to establish that the three UC administrators in the police chain of command "set[] in motion a series of acts" that they "knew or reasonably should have known" would cause the officers "to inflict a constitutional injury." *See id.* at 1207–08. Without that crucial connection, plaintiffs' argument is nothing more than an attempt to hold the UC administrators liable solely by virtue of their office. That argument fails because "there is no respondeat superior liability under section 1983." *Jones*, 297 F.3d at 934.

The UC administrators' alleged directive to "take all tents down immediately" does not supply the missing connection. In asking police to remove the tents, the UC administrators had no reason to assume that police would use force beyond the bounds of UCPD policy. Their awareness that some protestors had been injured during the afternoon protest hardly shows police exceeded those bounds or that they would during the evening protest. Injuries could be caused by lawful uses of the batons or by others in the crowd.

We conclude that Chancellor Birgeneau, Executive Vice Chancellor Breslauer, and Police Chief Celaya did not have sufficient personal involvement in the alleged acts of force. Summary judgment should have been granted by the district

court on these claims, and we reverse and remand for the district court to do so.

## D.

We next turn to the supervisory force claims against UCPD officers Lieutenant DeCoulode and Sergeant Tucker.

Plaintiffs Alvarado-Rosas, Kingkade, Klinger, and Wagaarachchi have not identified any police officer that allegedly used force against them. Likewise, plaintiffs Escobar, Helm, and Stumpf have not identified any UCPD officer that allegedly used force against them. While plaintiffs need not bring a direct force claim, they still must show (1) that an officer used excessive force against them, *Jackson*, 268 F.3d at 653–54, and (2) the requisite causal connection between that officer, on the one hand, and Lieutenant DeCoulode or Sergeant Tucker, on the other. *Starr*, 652 F.3d at 1207. Even assuming that a plaintiff could meet both steps without ever identifying the underlying officer (for example, by naming officers disjunctively), these plaintiffs have not done so. None has shown that the officer who allegedly used excessive force against him or her was among those in Lieutenant DeCoulode or Sergeant Tucker's chain of command. Nor have they provided evidence that Lieutenant DeCoulode or Sergeant Tucker ordered or failed to stop any action that he "knew or reasonably should have known" would cause the officer to use excessive force. *See id*. We reverse and remand for the district court to grant summary judgment in favor of defendants on these claims.

Plaintiff McDonald did not allege that any officer used force against him while acting under the command of either Lieutenant DeCoulode or Sergeant Tucker. We reverse and remand for the district court to grant summary judgment in favor of both officers on McDonald's claims.

E.

After eliminating the above claims, that still leaves supervisory claims of (1) plaintiffs Felarca, Mulholland, and Tombolesi against both Sergeant Tucker and Lieutenant DeCoulode, and (2) plaintiffs Lynch and Chung against Lieutenant DeCoulode.

**1.**

Plaintiff Felarca alleged that three named UCPD officers jabbed her in her abdomen with their batons, while acting under the command of Lieutenant DeCoulode and Sergeant Tucker. She later went to the hospital and had multiple bruises on her ribs and midsection.

Plaintiff Mulholland alleged that two named UCPD officers jabbed her in her abdomen with their batons, while acting under the command of Lieutenant DeCoulode and Sergeant Tucker. She left the front of the crowd after the blows. She had a bruise on her arm and on her abdomen. She was diagnosed with a cracked rib.

Plaintiff Lynch alleged that at the afternoon protest a named UCPD officer struck him with an overhand baton swing on his right forearm, while acting under the command of Lieutenant DeCoulode. He had swelling and bleeding. He treated his arm with ice from a nearby café and later went to the emergency room to have his arm x-rayed. He returned for the evening protest.

Plaintiff Tombolesi alleged that two named UCPD officers jabbed him in his ribcage and chest with their batons, "perhaps ten times," at the afternoon protest. He also alleged that three named UCPD officers hit him "many more times," even after he had fallen over, while acting under the

command of Lieutenant DeCoulode and Sergeant Tucker. He was sore and had trouble breathing. He went home for a few hours and returned for the evening protest.

Plaintiff Chung alleged that a named UCPD officer jabbed him in his arms and ribcage with the officer's baton, while acting under the command of Lieutenant DeCoulode. At the time, he was recovering from a broken leg and still wearing a walking boot. He went to the emergency room.

Lieutenant DeCoulode testified that he commanded one of the officers named by plaintiffs Felarca, Mulholland, Lynch, and Tombolesi during the protest. Sergeant Tucker testified he was a supervisor over lower-ranking officers present. Plaintiffs offered evidence showing, they argue, that Lieutenant DeCoulode and Sergeant Tucker were standing nearby and giving orders to other officers, including one of the named officers, during the alleged incidents of force.

**2.**

Under the first step of the qualified immunity analysis, we must decide whether an officer supervised by Lieutenant DeCoulode or Sergeant Tucker used excessive force against each plaintiff. We believe this is a closer call than the direct force claims. Four of the five plaintiffs sought medical treatment for their injuries, and at least one of them alleged experiencing overhand strikes to his arm. None admitted provoking the police. But even assuming, without deciding, that subordinate officers used excessive force against each plaintiff, we conclude that plaintiffs Felarca, Mulholland, Lynch, Tombolesi, and Chung have not met their required burden to show the law was clearly established at the time that the officers' baton strikes violated their constitutional rights. *Sjurset*, 810 F.3d at 615.

To decide whether the law was clearly established under the second step, we must first "defin[e] the law at issue in a concrete, particularized manner." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). We define the law at issue here as follows: whether an officer violates clearly established law when, after several warnings to disperse have been given, the officer uses baton strikes on a plaintiff's torso or extremities for the purpose of moving a crowd actively obstructing the officer from carrying out lawful orders in a challenging environment. To meet their burden, plaintiffs must generally identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. *See id.*, citing *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

Plaintiffs have identified no such case. They devote scant argument to the second step and fail to address it at *all* as to these claims. Although the same cases supporting the first step may also support the second step, they do not do so here. For the reasons discussed in Part III.A, *supra*, plaintiffs' reliance on *Young* and *Headwaters* does not convince us that every reasonable officer would have concluded that the case law existing at the time of the force alleged here clearly established that such force was excessive.

Because these five plaintiffs have not shown that any officer violated a clearly established right, it necessarily follows that Lieutenant DeCoulode and Sergeant Tucker cannot have violated a clearly established right by supervising the officers who allegedly used force against these plaintiffs. Accordingly, we reverse the district court on the supervisory claims brought by these five plaintiffs against Lieutenant DeCoulode and Sergeant Tucker, and

remand for the district court to enter summary judgment in favor of the defendants.

## VI.

In conclusion, we reverse and remand for the district court to grant summary judgment in favor of all defendants. Each party shall bear its own costs.

**REVERSED AND REMANDED, WITH INSTRUCTIONS.**

---

WATFORD, Circuit Judge, concurring:

I join all but section III of the court's opinion.

In my view, the officers used excessive force when they struck plaintiffs with batons solely for the purpose of dispersing the crowd. The level of force used here was intermediate, not minimal, and neither plaintiffs nor the other protestors posed a threat to the safety of the officers (or anyone else) that could justify the use of intermediate force. *See Young v. County of Los Angeles*, 655 F.3d 1156, 1161–63 (9th Cir. 2011). Yes, plaintiffs were engaged in a mild form of "active resistance," in the sense that they, along with other protestors, locked arms and refused commands to let the officers reach the tents. But the protestors were otherwise peaceful, and the university's interest in overcoming their resistance was insubstantial. There was no urgent need to remove a handful of tents from campus. The tents weren't harming anyone; they weren't even blocking access to campus facilities. The university administrators just wanted to avoid the spectacle of having the tents remain overnight. That desire isn't weighty enough to justify the

serious risk of injury posed by striking students with metal batons.

Nonetheless, the officers are entitled to qualified immunity because the law at the time they acted did not clearly establish the illegality of their conduct. I would rule for the defendants on the direct force claims solely on that basis.