**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TASHA WILLIAMSON, an individual, *Plaintiff-Appellee*, <br><br> v. <br><br> CITY OF NATIONAL CITY; LUCKY NGUYEN; JOHN MCGOUCH, *Defendants-Appellants.* | No. 20-55966 <br><br> D.C. No. 3:18-cv-02394-WQH-JLB <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted June 10, 2021
Pasadena, California

Filed January 24, 2022

Before: Susan P. Graber, Consuelo M. Callahan, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Forrest

# SUMMARY[*]

## Civil Rights

The panel reversed the district court's denial of defendants' summary judgment motion asserting qualified immunity in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that police officers used excessive force when they removed plaintiff from a city council meeting where she and others were protesting.

The protest prevented the city council meeting from continuing and police officers warned the protesters that they had to leave the meeting room or they would be arrested. The protesters refused to leave and passively resisted being removed by going limp. Officers handcuffed the protesters and carried or pulled them by their arms from the meeting room. Plaintiff Tasha Williamson alleged that she suffered wrist and shoulder injuries when she was forcibly removed.

The panel determined that it had jurisdiction over this interlocutory appeal, noting that whether an officer's conduct violates the Fourth Amendment is a legal issue. The panel next held that it had jurisdiction over the denial of summary judgment on Williamson's California's Tom Bane Civil Rights Act (the Bane Act) claim, under the doctrine of pendent appellate jurisdiction because the rulings related to that claim and Williamson's Section 1983 claim were inextricably intertwined.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel concluded that the Officers did not violate Williamson's Fourth Amendment rights; therefore, there was no need to address the clearly-established prong of the qualified immunity analysis.  Even viewing the evidence in Williamson's favor, the type and amount of force used by the Officers in this case was minimal. The Officers did not strike Williamson, throw her to the ground, or use any compliance techniques or weapons for the purpose of inflicting pain on her.  Rather, they held her by her arms and lifted her so they could pull her out of the meeting room after she went limp and refused to leave on her own or cooperate in being removed.

The panel further concluded that although National City's interest in forcibly removing Williamson from the city council meeting was low, it was not nonexistent; the city was not required to permit the organized lawlessness conducted by the protestors.  The panel concluded that the severity of the officers' intrusion and the weight of National City's interests were aligned; that is, the city's interests were low, and the Officers' use of force was appropriately minimal. The Officers were therefore entitled to qualified immunity. Because the panel concluded that defendants did not violate Williamson's Fourth Amendment rights, it reversed the district court's decision denying summary judgment on Williamson's Bane Act claims.

**COUNSEL**

Lee H. Roistacher (argued), Mitchell D. Dean, and Heather E. Paradis, Dean Gazzo Roistacher LLP, Solana, Beach, California, for Defendants-Appellants.

Douglas S. Gilliland (argued), The Gilliland Firm, San Diego, California, for Plaintiff-Appellee.

**OPINION**

FORREST, Circuit Judge:

This excessive force case concerns how police officers responded to a protest that Plaintiff Tasha Williamson and others participated in during a National City, California, city council meeting. The protest prevented the city council meeting from continuing, and police officers warned the protesters that they had to leave the meeting room or they would be arrested. The protesters refused to leave and passively resisted being removed by going limp. Officers handcuffed the protesters and carried or pulled them by their arms from the meeting room. Williamson sued under 42 U.S.C. § 1983, alleging that she suffered wrist and shoulder injuries when she was forcibly removed. We conclude that the officers did not use excessive force in violation of the Fourth Amendment, and we reverse the district court's denial of the officers' summary judgment motion asserting qualified immunity.

## I. BACKGROUND[1]

### A. The protest

In July 2018, protestors, including Williamson, performed a "die-in" at a city council meeting in National City, related to the death of Earl McNeil, a black man who died in police custody.[2] At a predetermined time, the protestors disrupted the meeting by chanting, and several of them made their way toward the public speaking podium and city council members. After showing the city council members their "bloody hands," six protesters lay down on the ground near the podium, keeping their red-painted hands raised and chanting "I am Earl McNeil," and "you have blood on your hands." Several other people associated with the protest remained in the audience showing painted red hands, chanting, and video-recording the demonstration. The mayor called for order, but the protesters refused to stop their demonstration, and the council meeting was adjourned.

A few minutes after the protest began, National City police officers informed the protesters that they would be arrested if they did not leave the podium area. When the six protesters ignored repeated requests to leave, the officers

---

[1] Given the procedural posture of this case, we present the facts in the light most favorable to Williamson. *Ames v. King County*, 846 F.3d 340, 347 (9th Cir. 2017). However, "[w]e do not credit a party's version of events that the record, such as an unchallenged video recording of the incident, 'quite clearly contradicts.'" *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021) (quoting *Scott v. County of San Bernardino*, 903 F.3d 943, 952 (9th Cir. 2018)); *see also Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

[2] McNeil's death was ruled a homicide by the medical examiner. *See DA Releases Video of Earl McNeil's Detention by National City Police*, NBC News San Diego, Sept. 22, 2018.

began arresting them. The protesters had previously agreed that, if arrested, they would act as dead weight and refuse to cooperate with being removed. The six protestors followed through with this agreement, and officers pulled or carried each of them out.

### B. Williamson's arrest

Officers Lucky Nguyen and John McGough[3] (the Officers), handcuffed Williamson with her wrists behind her back and brought her to a seated position. But as they lifted her toward a standing position, they lost their grip on her and she rolled back to the ground on her stomach. The Officers then repositioned Williamson onto her back and again tried lifting her. Officer Nguyen held Williamson under her left arm, and Officer McGough held her under her right arm. As they lifted her up, Williamson initially placed her feet under her, but she did not support her own weight. The Officers struggled to lift Williamson and pulled her backward by her arms and wrists while she was in nearly a seated position. Williamson was loudly chanting before the Officers started removing her from the room. During the approximately 12 seconds that she was being pulled from the room, Williamson screamed continually. As the Officers and Williamson approached the exit door, Officer McGough released Williamson's upper right arm, and Officer Nguyen dragged her through the doorway alone, by her left wrist and forearm.

In the hallway outside the meeting room, Williamson told the Officers that they had hurt her shoulder, and they

---

[3] Officer McGough's name is spelled inconsistently throughout the record and the district court's decision. This opinion uses the spelling from Officer McGough's declaration.

called an ambulance. The Officers also double-cuffed Williamson to lessen the tension on her arms and make her more comfortable, but she complained that they were "still pulling" her arms in doing so. Paramedics arrived, evaluated Williamson, and offered to take her to the hospital, but she refused to go with them. The Officers then arrested Williamson and took her to a detention facility. After she was released the next morning, Williamson drove herself to the hospital. She suffered a sprained wrist, mild swelling, and a torn rotator cuff.[4]

## C.  Summary judgment proceedings

Williamson sued the Officers under 42 U.S.C. § 1983 and California's Tom Bane Civil Rights Act (the Bane Act), Cal. Civ. Code § 52.1, alleging that they used excessive force against her in violation of the Fourth Amendment. Specifically, she claimed that it was excessive for them to "pull[] the full weight of her body by her hyperextended arms." The Officers moved for summary judgment based on qualified immunity. The district court denied the Officers' motion concluding—in pertinent part—that Williamson "present[ed] a genuine issue of material fact as to the excessive force claim regarding [the Officers'] pulling of [Williamson]'s arms and hands such that a reasonable jury could find excessive force in violation of 42 U.S.C. § 1983." Considering whether existing law clearly established a constitutional violation, the district court held that "[i]t was clearly established at the time of the incident that Defendant

---

[4] The parties dispute whether the torn rotator cuff resulted from this incident or from a prior arrest that is the subject of a different lawsuit. Because this case is on appeal from a denial of summary judgment, we lack jurisdiction to resolve factual disputes and must accept Williamson's version of events. *See Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017).

Nguyen's and Defendant McGou[g]h's use of force must be reasonable under the circumstances."

## II.  DISCUSSION

We typically lack jurisdiction to hear interlocutory appeals from denials of summary judgment, but an exception exists for denials premised on qualified immunity. *Isayeva*, 872 F.3d at 944–45; *see* 28 U.S.C. § 1291. However, this exception is limited to legal issues, not factual disputes; whether an officer's conduct violated the Fourth Amendment is a legal issue. *See Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014). We have jurisdiction over the denial of summary judgment on Williamson's Bane Act claims under the doctrine of pendent appellate jurisdiction because the rulings related to that claim and Williamson's Section 1983 claim are inextricably intertwined. *See Huskey v. City of San Jose*, 204 F.3d 893, 903–04 (9th Cir. 2000). We review de novo "a district court's denial of summary judgment on qualified immunity grounds." *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017).

### A.  Section 1983 claims

The Fourth Amendment protects against unreasonable seizures. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021). An arrest is the "quintessential seizure of the person." *Id.* (internal quotation marks and citation omitted). Qualified immunity shields a police officer from liability for civil damages under Section 1983 "unless the officer[] violated a clearly established constitutional right." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1156 (9th Cir. 2020). Thus, the qualified-immunity analysis involves two prongs: (1) whether the officer's conduct violated a constitutional right, and (2) whether that right "was clearly established at the time of the events at issue." *Id.* Here, we conclude that

the Officers did not violate Williamson's Fourth Amendment rights; therefore, we have no need to address the clearly-established prong of the analysis.

"In evaluating a Fourth Amendment claim of excessive force, we ask 'whether the officers' actions [wer]e "objectively reasonable" in light of the facts and circumstances confronting them.'" *Rice*, 989 F.3d at 1121 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To determine whether an officer's actions were objectively reasonable, we consider: "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Id.* (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)) (internal quotation marks omitted). "We must judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). It is also well-established that police officers "are not required to use the least intrusive degree of force possible." *Lowry*, 858 F.3d at 1259 (internal quotations and citation omitted).

## 1.  Type and amount of force

We consider the "specific factual circumstances" of the case in classifying the force used. *Id.* at 1256. The nature and degree of physical contact are relevant to this analysis, *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994), as are the "risk of harm and the actual harm experienced," *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012). For example, in *Forrester* we held that police officers did not act unreasonably in using "pain

compliance techniques" against protesters because this use of force was "less significant than most . . . [where] police did not threaten or use deadly force and did not deliver physical blows or cuts." 25 F.3d at 807. Instead, the officers used "physical pressure . . . on the demonstrators' limbs in increasing degrees, resulting in pain." *Id.*; *see also Johnson v. County of Los Angeles*, 340 F.3d 787, 793 (9th Cir. 2003) (describing "hard pulling and twisting" used to remove a fleeing armed robbery suspect from a car as a "minimal intrusion" under the circumstances). Similarly, in *Felarca v Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018), we held that police officers' baton strikes and jabs against a mass of student protestors who blocked police from accessing tents erected on campus in violation of university policy was a minimal use of force under the circumstances. On the other hand, in *Nelson* we held that shooting someone in the face with a pepperball when trying to break up a party was a "significant" intrusion where "officers were advised not to shoot pepperballs indiscriminately or at individuals that were not posing a threat," "[t]he possibility of serious injury was apparent to the officers at the time of the shooting," and the pepperball caused "significant damage to [plaintiff's] eye." 685 F.3d at 878–79.

Even viewing the evidence in Williamson's favor, the type and amount of force used by the Officers in this case was minimal. The Officers did not strike Williamson, throw her to the ground, or use any compliance techniques or weapons for the purpose of inflicting pain on her. Rather, they held her by her arms and lifted her so they could pull her out of the meeting room after she went limp and refused to leave on her own or cooperate in being removed.

Moreover, the inherent risk of two officers pulling someone who has gone limp and refuses to move by her own

power is not significant. It cannot reasonably be disputed that the force the Officers used in this case was less significant than "yanking, pulling, jerking, and twisting" a person whose legs are pinned underneath a car seat—which we have deemed a minimal intrusion. *Johnson*, 340 F.3d at 792–93. Indeed, the officers' removing Williamson in the manner that they did also was a lesser degree of force than what was used in *Forrester* and *Felarca*, where officers used techniques and weapons to intentionally inflict physical pain on the protesters. In fact, the protesters in *Forrester* even argued that "dragging and carrying" them would have been a more reasonable use of force than the pain compliance techniques that the officers used. 25 F.3d at 807.

Finally, Williamson's injuries—a sprained wrist, mild swelling, and a torn rotator cuff—though not trivial, are roughly equivalent to those in *Forrester* (bruises, pinched nerve, broken wrist) and much less severe than those in *Johnson* (rendered a paraplegic). And in both of those cases, we concluded that the intrusion at issue was minimal despite the injuries that occurred. We conclude the same here.

In reaching a contrary conclusion, the district court focused exclusively on Williamson's injuries. But that is not the only factor relevant to this analysis; the type and amount of force used and the *risk* of harm it created must also be considered. *See Nelson*, 685 F.3d at 879. Consideration of both the actual harm and the risk of harm is important as the Fourth Amendment is concerned with reasonableness. *Id.* at 878. There can be situations in which the risk of harm presented is objectively less significant than the actual harm that results. And if a person reacts more adversely to a use of force than would be expected objectively, that does not *itself* establish that "a reasonable officer on the scene" failed

to appreciate the risks presented and act accordingly. *Rice*, 989 F.3d at 1121 (citation omitted).

For these reasons, we conclude that the totality of circumstances in this case establishes that the type and amount of force that the Officers used was minimal.

## 2. Governmental interest

Next, we "evaluate the state's interests at stake by considering '(1) how severe the crime at issue was, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.'" *Rice*, 989 F.3d at 1121 (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc)). "Among these considerations, the 'most important' is the second factor— whether the suspect posed an immediate threat to others." *Id.* (quoting *Isayeva*, 872 F.3d at 947). "These factors are non-exhaustive, and we examine the totality of the circumstances, including the availability of less intrusive alternatives to the force employed and whether proper warnings were given." *Id.* at 1121–22 (internal citation omitted). Where an arrestee's conduct risks the lives or safety of innocent bystanders, the court also considers her relative culpability under the second factor. *See Scott*, 550 U.S. at 384.

It is undisputed that Williamson's crime was minor, that she posed no threat to anyone, and that she was not actively resisting arrest. Nonetheless, the Officers argue that they had a legitimate interest in removing and arresting her, particularly where proper warnings were given before they used any physical force. They also argue that we should consider Williamson's "relative culpability" in refusing to get up. Williamson counters that the governmental interest

was "about as low as it gets," even considering her relative culpability.

We conclude that National City's interest in forcibly removing Williamson from the city council meeting was low, but it was not nonexistent. Williamson's nonviolent disruption of the city council meeting was a minor offense. And where Williamson's actions did not pose any physical danger to others, we do not consider her relative culpability. *See id.* But even if the city's interest was low given the lack of exigency posed by threat of harm or other factors, this does not mean that the city was "required to permit the 'organized lawlessness' conducted by the protestors." *Felarca*, 891 F.3d at 818. "Even passive resistance may support the use of some degree of governmental force if necessary to attain compliance . . . depend[ing] on the factual circumstances underlying that resistance." *Nelson*, 685 F.3d at 881 (quoting *Bryan v. MacPherson,* 630 F.3d 805, 830 (9th Cir. 2010)) (internal quotation marks omitted). Moreover, the risk posed by the protesters was not zero. While the six who laid down near the podium were docile and merely refused to leave the area when directed, other protesters (or people sympathetic to the protesters' demonstration) who remained in the audience area were yelling at the officers and at times trying to push into the podium area. This is not the same strain of risk posed by the crowds in *Forrester* and *Felarca*, but it is nonetheless relevant in assessing the totality of circumstances that the officers faced when they decided to remove the protesters participating in the demonstration rather than allow the demonstration to continue.

It goes without saying that citizens have a right to express their disagreement and dissatisfaction with government at all levels. But they do not have a right to

prevent duly installed government from performing its lawful functions. *See Felarca*, 891 F.3d at 818. To conclude otherwise would undermine the very idea of ordered society. *See id.* Officers repeatedly warned the protesters that they had to leave the front of the meeting room or they would be arrested, and they refused to comply. Their demonstration disrupted the city council meeting, which was adjourned "for order to be restored." National City's choice was to allow the protesters to remain in the city council's meeting room until they chose to leave on their own—which the constitution does not require—or to forcibly remove them. Williamson has not identified any less intrusive means available to the Officers for restoring order in the city council room so that the city's legitimate business could proceed. Other means of physically removing her when she refused to leave or cooperate with being moved, such as using more officers to carry her or pulling her by her legs instead of her arms, would not have involved an appreciably smaller risk of causing pain or injury. In sum, we conclude that, as in *Forrester*, National City had a legitimate interest in "dispersing and removing lawbreakers," but the extent of its interest was low because it was not facing a voluminous crowd acting with a "concerted effort to invade private property, obstruct business, and hinder law enforcement," as was the case in *Forrester*. 25 F.3d at 807; *see also Felarca*, 891 F.3d at 818; *Nelson*, 685 F.3d at 880 ("Although the officers plainly had an interest in clearing the apartment complex . . . , the desire to do so quickly, in the absence of any actual exigency, cannot legitimize the application of force when it is not otherwise justified.").

### 3. Balance of interests

Finally, we must weigh the Officers' intrusion onto Williamson's Fourth Amendment rights through their use of

physical force against National City's interests in responding to illegal conduct and restoring order in the city council meeting room. We conclude that the severity of the Officers' intrusion and the weight of National City's interests are aligned; that is, the city's interests were low, and the Officers' use of force was appropriately minimal.

Williamson testified that she and the other protesters had decided in advance that they would not willingly leave the meeting room. The very purpose of their protest was to disrupt the city council meeting and interfere with the city conducting its business. Thus, they created a situation in which the city had to either succumb to the disruption or use some amount of force to remove the protesters from the meeting room. The city chose the latter, and the "undisputed evidence shows that the officers used only the force reasonably necessary to remove [Williamson] from the meeting." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 826 (9th Cir. 2013) (per curiam).

Williamson could have avoided or reduced the pain and injury she alleges she suffered from the Officers' conduct by cooperating with them and leaving the room under her own power. She did not. But her choice does not render the Officers' conduct unreasonable. To conclude otherwise would be to discount entirely the City's legitimate interests in maintaining order and ensuring that the public's business is not circumvented by people engaging in disruptive, albeit nonviolent, conduct.

Because we conclude that the Officers did not use excessive force in violation of Williamson's Fourth Amendment rights, they are entitled to qualified immunity as a matter of law.

## B.  California Bane Act claims

California's Bane Act requires proof of an underlying constitutional violation. *Reese v. County of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) ("[T]he elements of the excessive force claim under [the Bane Act] are the same as under § 1983[.]" (quoting *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014))). Because we conclude that the Officers did not violate Williamson's Fourth Amendment rights, we reverse the district court's decision denying summary judgment on Williamson's Bane Act claims as well.

**REVERSED.**