**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PUENTE, an Arizona nonprofit corporation; PODER IN ACTION, an Arizona nonprofit corporation; IRA YEDLIN; JANET TRAVIS; CYNTHIA GUILLEN; JACINTA GONZALEZ GOODMAN, individually and as class representatives, | No. 22-15344 |
| | D.C. No. 2:18-cv-02778-JJT |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| CITY OF PHOENIX, a municipal corporation; MICHAEL SULLIVAN, in his official capacity; JERI L. WILLIAMS; GLENN NEVILLE; JOHN STICCA; LANE WHITE; UNKNOWN PARTIES, Does 1-20, | |
| *Defendants*, | |
| and | |
| BENJAMIN MOORE, individually and in their official capacities; DOUGLAS MCBRIDE; ROBERT SCOTT; CHRISTOPHER TURIANO; JEFFREY HOWELL; GEORGE HERR, | |

*Defendants-Appellants*.

PUENTE, an Arizona nonprofit corporation; IRA YEDLIN; JANET TRAVIS; CYNTHIA GUILLEN; JACINTA GONZALEZ GOODMAN, individually and as class representatives; PODER IN ACTION, an Arizona nonprofit corporation,

*Plaintiffs-Appellants*,

v.

CITY OF PHOENIX, a municipal corporation; MICHAEL SULLIVAN, in his official capacity; BENJAMIN MOORE, individually and in his official capacity; JERI L. WILLIAMS; DOUGLAS MCBRIDE; ROBERT SCOTT; CHRISTOPHER TURIANO; JEFFREY HOWELL; GEORGE HERR,

*Defendants-Appellees*,

and

GLENN NEVILLE; JOHN STICCA; LANE WHITE; UNKNOWN PARTIES, Does 1-20,

*Defendants*.

No. 22-15661

D.C. No. 2:18-cv-02778-JJT

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted May 16, 2023
Phoenix, Arizona

Filed December 19, 2024

Before:  Jacqueline H. Nguyen, Daniel P. Collins, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### Civil Rights/Excessive Force

The panel reversed the district court's partial denial of summary judgment to Phoenix Police Department ("PPD") defendants and affirmed the district court's partial grant of summary judgment to PPD defendants in an action under 42 U.S.C. § 1983 brought by two organizations and four individuals asserting a variety of claims arising from actions that defendants took against political demonstrators protesting outside a rally held by then-President Trump at the Phoenix Convention Center on August 22, 2017.

Plaintiffs alleged that defendants violated their constitutional rights under the First, Fourth, and Fourteenth

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Amendments by dispersing protesters through the use of tear gas, other chemical irritants, and flash-bang grenades. After certifying two distinct classes, the district court ultimately granted summary judgment to defendants on all claims except for the individual Fourth Amendment excessive-force claims asserted by three of the individual plaintiffs against certain PPD officers.

The panel affirmed the district court's summary judgment for defendants on the class claims for excessive force under the Fourth and Fourteenth Amendments. There was no "seizure" of the class members within the meaning of the Fourth Amendment because the record showed that defendants' use of airborne and auditory irritants was not objectively aimed at restraining the class members, even temporarily. Because the class's excessive-force claims arose outside the context of a seizure, the panel evaluated those claims under the Fourteenth Amendment shocks-the-conscience test rather than the Fourth Amendment's objective reasonableness standard. Given the quickly escalating situation, there was no triable issue that the officers had an improper purpose to harm rather than legitimate law enforcement objectives at the time they decided to employ chemical irritants and flash-bang grenades to disperse the crowd.

The panel reversed the district court's denial of summary judgment to the individual defendants on the excessive-force damages claims asserted by individual plaintiffs Yedlin, Travis and Guillen, who were physically impacted by projectiles. The panel held that the officers were entitled to qualified immunity because they acted reasonably under the circumstances or did not violate clearly established law.

The panel next affirmed the district court's summary judgment for the individual defendants with respect to the First Amendment claims asserted by all plaintiffs, on their own behalf, and on behalf of the classes. The individual defendants were entitled to qualified immunity because, based on the undisputed facts, including the use of unidentified gas and pyrotechnic devices by agitators, there were sufficient objectively reasonable grounds to establish the requisite clear and present danger of an immediate threat to public safety, peace, or order. Moreover, there was no triable issue that the dispersal of the crowd was undertaken with retaliatory intent.

The panel affirmed the district court's summary judgment to Police Chief Williams. Because the panel concluded that all of Plaintiffs' claims either fail or did not involve the violation of a clearly established right, Plaintiffs' claims of supervisorial liability necessarily fail. Finally, the panel affirmed the district court's summary judgment to the City of Phoenix on the municipal liability claim. Plaintiffs failed to raise a triable issue that Chief Williams caused or ratified the use of excessive force against Guillen or that the City was deliberately indifferent to Guillen's constitutional rights.

**COUNSEL**

Gerard J. Cedrone (argued), Goodwin Procter LLP, Boston, Massachusetts; Alexis S. Coll, Indra N. Chatterjee, and Yoo N. Lee, Goodwin Procter LLP, Redwood City, California; Andrew Kim, Goodwin Procter LLP, Washington, D.C.; James Nikraftar, Goodwin Procter LLP, Santa Monica, California; Kathleen E. Brody, Mitchell Stein Carey Chapman PC, Phoenix, Arizona; Darrell Hill and Jared G. Keenan, American Civil Liberties Union of Arizona, Phoenix, Arizona; Paul L. Hoffman, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Hermosa Beach, California; John C. Washington, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Los Angeles, California; Barrett S. Litt, McLane Bednarski & Litt LLP; Pasadena, California; Dan Stormer, Hadsell Stormer & Renick LLP, Pasadena, California; Hong-An Vu, Foundation Law Group LLP, Los Angeles, California; Cindy Pánuco, Nisha Kashyap, and Joanna E. Adler, Public Counsel, Los Angeles, California; for Plaintiffs-Appellees.

Mary R. O'Grady (argued), David B. Rosenbaum, and Joshua J. Messer, Phoenix, Arizona; Steven J. Renick (argued), Mildred K. O'Linn, and Scott Wm. Davenport, Manning & Kass Ellrod Ramirez Trester LLP, Los Angeles, California; for Defendants-Appellants.

# OPINION

COLLINS, Circuit Judge:

In this action under 42 U.S.C. § 1983, two organizations and four individuals assert a variety of claims arising from the actions that the Phoenix Police Department ("PPD") took against political demonstrators protesting outside a rally held by then-President Trump at the Phoenix Convention Center on August 22, 2017. In particular, Plaintiffs allege that the PPD violated their constitutional rights under the First, Fourth, and Fourteenth Amendments by dispersing the protesters through the use of tear gas, other chemical irritants, and "flash-bang grenades" that "produce loud explosive noises and bright flashes of light." After certifying two distinct classes—one for certain damages claims and another for injunctive relief—the district court ultimately granted summary judgment to Defendants on all claims except for the individual Fourth Amendment excessive-force claims asserted by three of the individual Plaintiffs against certain officers. Those officers have appealed that partial denial of summary judgment, arguing that they are entitled to qualified immunity. After the district court certified its partial judgment against Plaintiffs for immediate appeal under Federal Rule of Civil Procedure 54(b), Plaintiffs appealed that judgment as well. We reverse the district court's partial denial of summary judgment to Defendants, and we affirm the court's partial grant of summary judgment to Defendants on all remaining claims.

# I

## A

Because this appeal challenges a partial grant and partial denial of summary judgment to Defendants, we recite the underlying facts by construing the record evidence in the light most favorable to Plaintiffs. *See O'Doan v. Sanford*, 991 F.3d 1027, 1035 (9th Cir. 2021).

On August 22, 2017, then-President Trump held a scheduled rally at the Phoenix Convention Center. After the announcement of the rally, various organizations announced their intention to protest outside the event. These included Plaintiffs Poder in Action ("Poder") and Puente, which are Phoenix-based membership organizations that engage in advocacy concerning immigrants' rights and other issues. In anticipation of the rally and accompanying counter-protests, the PPD coordinated with federal, state, and local agencies to develop a security plan.

As part of that security plan, the PPD decided to designate two separate areas for security and protest-assembly purposes. The first of these was the so-called "Free Speech Zone," on the block immediately north of the convention center, where "anti-Trump protesters were expected to gather."[1] The second of these was the so-called "Public Safety Zone," which ran between the Free Speech Zone and the convention center itself. In order to facilitate emergency vehicle and police access, the Public Safety Zone (which included the street between the Free Speech Zone and the convention center) was closed to the public and was fenced off from the Free Speech Zone. The following image

---

[1] On appeal, Plaintiffs do not raise any contention that the establishment of the Free Speech Zone was itself unconstitutional.

from the record shows the position of the Free Speech Zone (marked as the "Protest Area"):



The Free Speech Zone began on the north side of Monroe Street and ran between 2nd and 3rd Street. The Public Safety Zone included the entirety of Monroe Street itself and ran eastward from 2nd Street all the way to 5th Street (which is not included in the above image).

Acting through its Community Relations Bureau ("CRB"), the PPD also communicated with local groups who had notified the PPD that they were planning demonstrations. These efforts included a meeting, the day before the rally, between a Detective in the CRB and "the protest organizer" for Puente. Various protest organizers met with members of the CRB to discuss their plans, arrange for delivery of supplies, and coordinate a police escort to the Free Speech Zone on the day of President Trump's rally.

The PPD anticipated the possibility of isolated unlawful conduct occurring in the vicinity of the rally.  Among the "potential threats" or weapons that the PPD thought might possibly be used were "improvised incendiary devices, guns, knives, rocks, and human excrement."  Based on its experience with prior protests, the PPD also had specific concerns about the decentralized movement known as "Antifa," whose members the PPD believed might attend the event.  The PPD was aware that Antifa members had engaged in violence or vandalism at previous public political events.

Nonetheless, the PPD's planning for this specific event did not include any particularized rules of engagement concerning the use of force beyond those applicable to such deployments generally.  Similarly, while the PPD anticipated that it might need to declare an unlawful assembly, it did not create a specific plan for doing so and instead distributed general guidance regarding the unlawful assembly statute to its officers.  The PPD's general training emphasized the tactic of isolating and addressing groups of individuals acting unlawfully within a larger protest.

The PPD also planned to have available at the event a contingent of persons from its "Tactical Response Unit" ("TRU").  This group, also known as the "Field Force," is a specialized PPD unit that responds to civil disturbances.  Its members are trained on, and governed by, specific PPD policies covering potential uses of force.  This training includes guidance for protecting First Amendment assembly and free speech rights.  Defendant Lieutenant Benjamin Moore headed the TRU deployment at this particular event.

Within TRU is an even more specialized group called the Grenadiers.  Grenadiers train in the use of chemical agents

and munitions such as "pepper balls"—concentrated powdered chemical projectiles that induce a physical reaction similar to that caused by pepper spray. That training includes instruction on when and how to appropriately deploy chemical agents. Although Grenadiers are present at dozens of protests each year, the most recent prior incident where they actually used chemical agents was in July 2016. All named Defendants in this case who are individuals (except for Police Chief Jeri Williams) were experienced Grenadiers who had overseen multiple protests prior to August 22, 2017. Moore in particular had overseen hundreds of protests.

## B

Pursuant to its security plan and to prevent protesters in the Free Speech Zone from occupying the Public Safety Zone on Monroe Street, the PPD erected a three-foot high pedestrian fence "threaded with yellow police tape that said 'Police Line Do Not Cross.'" To handle the crowds, approximately 985 public safety employees—including TRU officers and Grenadiers—were deployed in the area. The PPD also stationed undercover officers in the Free Speech Zone to observe the demonstrators' activities and to monitor the crowd for possible threats throughout the afternoon and evening.

Protesters began arriving outside the convention center on the morning of August 22. As noted earlier, some protest groups had notified the CRB in advance of their intention to protest, and the CRB assisted them with logistical details, including escorting some groups as they made their way to the convention center area. Members of Plaintiffs Puente and Poder arrived at the Free Speech Zone shortly after 4:00 PM and demonstrated there for several hours.

Approximately 6,000 people gathered outside the convention center at the height of the protest, which proceeded without major incidents during the day. President Trump arrived at the convention center around 6:30 PM, and the demonstrators continued to remain largely peaceful.

The first violent incidents occurred shortly after 7:00 PM, when unknown persons in the Free Speech Zone began throwing water bottles across Monroe Street at the police and at those waiting in line to enter the convention center. The PPD responded by moving additional TRU officers to Monroe Street and by broadcasting a loud message using a long-range acoustic device ("LRAD") reminding protesters to stop throwing objects and to remain peaceful. Around that time, Moore received reports regarding the presence of potential Antifa members in the crowd, and he ordered his officers to watch them and attempt to communicate with them. About an hour later, around 8:00 PM, Moore received specific reports that certain of these potential Antifa members were carrying signs, including signs on tall poles. Antifa members were known to have used "tall signs" in the past to topple fences and barriers, and Moore suspected that a similar attempt might be made to breach the fence separating the Public Safety Zone from the Free Speech Zone.

At 8:05 PM, Moore was informed that approximately 10 to 20 individuals thought to be members of Antifa were beginning "to start some trouble" in the Free Speech Zone. Given the group's distinctive clothing, banners, and behavior, Moore was able to identify several suspected Antifa members within the crowd in the Free Speech Zone, and at approximately 8:07 PM, he directed the head of the Grenadiers, Sergeant Douglas McBride, to "get eyes on it." According to McBride, the Antifa members were acting

aggressively and shouting profanities. Around the same time, officers observed suspected Antifa members shove a protester who had told them to stop throwing objects. CRB officers approached these members and attempted to talk with them in an effort to de-escalate the situation, but the officers reported to Moore that the members would not communicate with them. McBride made all Grenadiers aware of the suspected Antifa members in the crowd, but the PPD did not attempt to remove or arrest these people at this time.

At 8:11 PM, Moore was informed that President Trump's motorcade would soon depart from the convention center. At 8:15 PM, Moore was informed that people were throwing water bottles down from a parking garage located at the edge of the Free Speech Zone, requiring the deployment of TRU officers to secure the building. The PPD used the LRAD to make continuous announcements to warn people not to throw objects.

Around 8:20 PM, Moore noticed that the suspected Antifa members had erected large signs near the fence separating the Free Speech Zone from the Public Safety Zone on Monroe Street. The PPD officers approached and saw these members hooking their flags and banners to the fencing; Moore believed that this could be a tactic to breach the fence. At about 8:30 PM, Moore noticed these members gathering behind the signs, and other officers reported seeing them opening bags and handing out unidentified items. The PPD officers did not attempt to separate these individuals from the crowd of protesters. Moore directed McBride to prepare the Grenadiers in the Public Safety Zone to deploy pepper balls if the suspected Antifa members tried to breach the fence.

Around 8:32 PM, the suspected Antifa members began pushing the fence. Moore ordered officers to fire pepper balls at the ground in front of the suspected Antifa group. These pepper balls released "PAVA powder," which temporarily irritates the eyes of persons nearby. As a result, some members of the group dispersed into the crowd of protesters. The PPD did not provide warnings or attempt to make arrests before firing the pepper balls. In a declaration, Moore explained he made the decision not to attempt individualized arrests based on his belief that the suspected Antifa group's members "had not committed a crime or given cause for arrest" and that—even if they had—sending officers into the crowd to conduct arrests would risk hand-to-hand violence, strain police manpower, and require opening the police fence. Some Antifa members remained, however, and another person who was not a suspected Antifa member but who was standing near the fence began shaking it with some force. That person was Plaintiff Ira Yedlin. According to Moore, "Grenadiers then deployed more pepper balls in that area." Yedlin was physically hit by some of these pepper balls.

With the suspected Antifa members then cleared away from the police fence and dispersed among the crowd, Moore directed the Grenadiers to "hold off" from firing any more pepper balls to see whether the unlawful activity would stop. But the activity instead escalated, with individuals in the Free Speech Zone throwing rocks, water bottles, and other objects at an increasing rate. This escalation in violence coincided with President Trump's motorcade leaving the convention center at around 8:33 PM. At 8:34 PM, an individual in the Free Speech Zone threw a canister into the Public Safety Zone that began emitting an unknown gas. Moore ordered the officers present to don gas masks

and to "deploy smoke canisters." The smoke itself is "inert" and does not produce the same physical effects as tear gas. Although the smoke was deployed in an effort to "defuse the situation, create distance, and . . . avoid escalating tactics," it did not succeed. Although some in the crowd left when the PPD deployed the smoke, many in the crowd continued to throw objects back at police; indeed, "the frequency of items being thrown at officers significantly increased." The objects being thrown included a "pyrotechnical munition" of some kind, which burned for a few minutes before being extinguished by police.

Moore concluded that, once these unknown devices were thrown at officers, the assembly had become unlawful, but he did not make any announcement to that effect. He instead ordered the Grenadiers to deploy tear gas and authorized the further use of pepper balls as well as other riot-control devices. From approximately 8:35 PM to 8:45 PM, PPD officers began dispersing the crowd in the section of the Free Speech Zone immediately across from the Phoenix Convention Center by using tear gas and flash-bang grenades. At 8:39 PM, Moore ordered the Grenadiers to cut a gap in the police fence, enter the Free Speech Zone, and begin clearing the remaining individuals in the area using "targeted munitions like pepper balls when necessary to drive back any threatening or aggressive individuals." He also organized a "skirmish line" of officers to walk slowly down Monroe Street from 3rd Street to 2nd Street, where there seemed to be a larger number of "unlawful actors." As that line of officers proceeded down Monroe Street, some members of the TRU "deployed pepper spray from handheld canisters at or near specific individuals they perceived as threatening or aggressive."

At some point between 8:42 PM and 8:47 PM, Moore decided to make a declaration that the assembly was unlawful.  This declaration was first announced at 8:52 PM by a PPD helicopter using a public address system above the Free Speech Zone—though the noise and chaos of the concurrent police action substantially diminished protesters' ability to understand and respond to the orders.  At 9:02 PM, a police vehicle at the intersection of Second and Monroe Streets—one corner of the Free Speech Zone—began repeatedly communicating unlawful-assembly declarations as well.  To clear those protesters remaining in the Free Speech Zone, at 9:04 or 9:05 PM, TRU officers formed another skirmish line and slowly marched north along Second Street.  Officers in the line used further non-lethal munitions—including pepper balls and spray—against particular individuals continuing to throw objects or otherwise act aggressively.  Plaintiff Janet Travis, who was recording the events from a position directly in front of the skirmish line, was hit by a projectile.

By approximately 9:10 PM, the PPD had cleared the last remaining individuals away from the Free Speech Zone.  The PPD arrested a total of five people over the course of the day, none of whom are Plaintiffs in this case.

At a post-event press conference, Police Chief Williams stated that, in her view, officers handled the crowd "successfully and professionally" and that "all in all" the event was "a successful celebration."  She later stated that the department's conduct was "textbook perfect."  In a subsequent memorandum to the City Manager, Ed Zuercher, Williams wrote that she "believe[d] the actions of [her] officers reflected the direction [she] gave them."  Zuercher responded, writing that what the PPD "accomplished on August 22 was notable" and hailed the officers'

"professionalism in ensuring the safety and First Amendment rights of the community." Zuercher informed Williams that the City planned to conduct an independent investigation of the PPD's conduct at the event, but he added that his request did not "diminish the professionalism of our Phoenix Police officers."

Sometime after the protest, a "challenge coin" commemorating the events of August 22, 2017 was created. On one side, the coin depicted a protestor being hit in the groin by a munition. That side also bore the inscription "Good night left nut." On the other side was the date of the protest surrounded by the inscription "Making America great again one nut at a time." At least four PPD officers possessed the coin, and at least one officer sold and distributed it.

## C

On September 4, 2018, Plaintiffs filed this action in the district court, alleging that the PPD's actions in dispersing the crowd of protesters constituted excessive force under the Fourth and Fourteenth Amendments, deprived the protesters of their First Amendment speech rights, and discriminated against the protesters in contravention of the Fourteenth Amendment's Equal Protection Clause.

In September 2019, the district court certified two classes.[2] First, the court held that, under Federal Rule of Civil Procedure 23(b)(3), individual Plaintiffs Gonzalez Goodman, Guillen, and Travis could represent the following class seeking damages with respect to certain claims alleging excessive force under the Fourth and Fourteenth

---

[2] Neither side challenges the class certification order on appeal, and we therefore do not address any issue concerning whether the district court properly certified a class action in this case.

Amendments, deprivation of First Amendment rights, and discrimination in contravention of the Fourteenth Amendment's Equal Protection Clause:[3]

> "[T]hose persons who were present on August 22, 2017" in the Free Speech Zone "and forced by PPD onto adjacent streets at any point between 8:25 and 10:00 P.M., who neither threw objects nor attempted to breach the 'free speech zone' barrier along Monroe Street, and who were subjected to the PPD's dispersal by the use of force, or other unlawful police activity arising from the police response to anti-Trump protestors," and "who were unlawfully dispersed *by the use of gas, pepper spray, pepper bullets, or other chemical agents*" (emphasis added).

The district court also held, under Rule 23(b)(2), that the same three individuals, as well as Puente and Poder, could

---

[3] The district court's certification order should itself have clearly stated the exact definition of the damages class that it was certifying and the relevant claims. *See* FED. R. CIV. P. 23(c)(1)(B) (stating that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses"). Here, we are able to discern the damages class's definition only by reading the court's order together with other documents in the record. Moreover, the order, standing alone, clearly suggests that the equal protection claim was being certified for class treatment together with the First Amendment claim, but the court later confusingly suggested in its summary judgment order that it had *not* certified a class as to the equal protection claim.

represent the following certified class seeking injunctive relief:

> "[A]ll persons who have in the past, including those present at the anti-Trump protest on August 22, 2017, between 8:25 and 10:00 P.M., or may in the future, participate in, or be present at, demonstrations within the City of Phoenix in the exercise of their rights of free speech and assembly without engaging in any conduct justifying the use of force."

The court, however, rejected Plaintiffs' request to certify an additional damages class with respect to persons who had been "struck with projectiles of any type," concluding that the claims of such persons raised individualized issues that precluded classwide treatment.

At the close of discovery, the parties cross-moved for summary judgment. In February 2022, the district court denied Plaintiffs' motion in its entirety and granted Defendants' motion in part.

First, the district court granted summary judgment to Defendants on all claims brought by the two certified classes.

Regarding the classes' excessive-force claims, the district court began by addressing whether those claims were properly evaluated under the Fourth Amendment's "objectively reasonable" standard, *see Graham v. Connor*, 490 U.S. 386, 397 (1989), or the Fourteenth Amendment's "shocks the conscience" standard, *see County of Sacramento v Lewis*, 523 U.S. 833, 846–47 (1998); *Wilkinson v. Torres*,

610 F.3d 546, 554 (9th Cir. 2010). That issue turned on whether the use of force in connection with the deployment of chemical agents involved a "seizure" within the meaning of the Fourth Amendment, and the district court held that it did not. Applying the relevant Fourteenth Amendment substantive due process standards, the district court held that there was no evidence in the record from which a reasonable jury could conclude that Defendants acted with the requisite "purpose to harm unrelated to legitimate law enforcement objectives."

The district court also granted summary judgment to Defendants on the classes' First Amendment claim. Noting that the parties disagreed as to the applicable First Amendment standards, the court held that Plaintiffs' claim failed either way. Applying Defendants' preferred standards, the district court held that Plaintiffs "failed to demonstrate a genuine issue of material fact as to whether chilling class members' First Amendment rights was a substantial or motivating factor that caused the officers to take the actions they did." Applying Plaintiffs' preferred standards in the alternative, the district court also held that "no reasonable jury could conclude from the evidence that the officers did not have adequate justification for their actions." The court further concluded that the equal protection claim "fails with Plaintiffs' First Amendment claim."

Having resolved all of the class claims, the district court addressed the named Plaintiffs' remaining claims. The court held that Puente's and Poder's claims all failed as a matter of law. To the extent that these organizations asserted claims on their own behalf or any non-class claims for injunctive relief, the court held that the evidence proffered by Puente and Poder did "not go materially further than that pertaining

to the class members," and any such claims failed for the same reasons. And to the extent that Puente and Poder also purported to invoke "associational standing" to assert any remaining non-injunctive claims on behalf of their members, such claims would require the participation of such individual members, and therefore did not qualify for associational standing under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977).

The district court granted Defendants' motion for summary judgment on the individual claims brought by Gonzalez Goodman because, as with Puente and Poder's claims, the court concluded that "the evidence related to [her] claims d[id] not go materially further than that pertaining to the class members."

However, the district court denied summary judgment to the relevant individual officers with respect to the individual Fourth Amendment excessive-force claims asserted by Yedlin, Travis, and Guillen. The district court held that, because they had actually been struck by projectiles, Yedlin, Travis, and Guillen *were* "seized" within the meaning of the Fourth Amendment and that a genuine dispute of material fact existed as to whether the force used against them was reasonable. The court further held that the constitutional right "not to be subjected to unreasonable force during a seizure—by way of the deployment [of] pepper balls, muzzle blasts, and pepper spray—where less severe or intrusive means of applying force were available and sufficient in the circumstances" was clearly established at

the time, and the district court therefore denied qualified immunity to the relevant officers as to these claims.**[4]**

The district court nonetheless granted summary judgment to Defendants on Yedlin's, Travis's, and Guillen's First Amendment and equal protection claims, holding that there was insufficient evidence in the record to show that "chilling Plaintiffs' First Amendment rights was a substantial motivating factor for the officers' actions, let alone . . . a but-for cause."

The district court also granted summary judgment against Plaintiffs on all claims against Williams and the City of Phoenix.  In contrast to Moore and McBride, the district court concluded that there was insufficient evidence in the record to demonstrate that Williams "reasonably should have known that the actions she set in motion . . . would cause officers to inflict constitutional injuries," and that she could therefore not be found liable as a supervisor under *Felarca v. Birgeneau*, 891 F.3d 809, 819–20 (9th Cir. 2018). The court also held that the record did not support a finding that any of the constitutional violations Plaintiffs alleged were caused by an official policy or custom of the City of Phoenix and that consequently there was no basis for municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

---

[4] The officers involved in the particular incidents involving these three individual Plaintiffs differed.  Specifically, the court allowed Yedlin's excessive-force claim to go forward against Defendants Robert Scott, Jeffrey Howell, and George Herr; Travis's excessive-force claim to go forward against Defendants Christopher Turiano and Howell; and Guillen's excessive-force claim to go forward against Defendants Scott, Howell, Herr, and Turiano.  The district court further held that McBride and Moore could be held liable on these three claims under a theory of supervisorial liability.

Finally, the court held that there was sufficient evidence to allow Plaintiffs to seek punitive damages on the individual excessive-force claims that had survived summary judgment.

The six individual Defendants against whom individual excessive-force claims were allowed to proceed filed a timely interlocutory appeal from the district court's denial of qualified immunity.  Thereafter, the court granted Plaintiffs' unopposed motion for entry of a partial judgment, under Rule 54(b), on all decided claims.  Plaintiffs timely appealed that adverse partial judgment.  We have jurisdiction over both appeals under 28 U.S.C. § 1291. *See Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1160 (9th Cir. 2023); *Estate of Anderson v. Marsh*, 985 F.3d 726, 730–31 (9th Cir. 2021).

## II

We turn first to Plaintiffs' class claims of excessive force under the Fourth and Fourteenth Amendments.[5]  As noted earlier, the district court certified a damages class, but only with respect to persons in the Free Speech Zone "who were unlawfully *dispersed* by the use of gas, pepper spray, pepper bullets, or other chemical agents."  Plaintiffs contend that the district court erred in concluding that the excessive-force

---

[5] Because Plaintiffs do not dispute the district court's determination that the evidence concerning the various claims asserted by Puente, Poder, and Gonzalez Goodman were co-extensive with those of the classes, we will not separately discuss the claims of those three Plaintiffs.  Our holdings with respect to the class claims are dispositive of any separate claims of Puente, Poder, and Gonzalez Goodman.  Plaintiffs' opening brief also does not contest the district court's determination that, if the district court correctly held that the damages class's excessive-force claims failed, then Plaintiffs' class claims for injunctive relief based on excessive-force also fail.  We therefore do not separately discuss such injunctive claims.

claims of these class members were governed by Fourteenth Amendment standards rather than Fourth Amendment standards. They also contend that, under either set of standards, summary judgment for Defendants was improper. We consider these contentions in turn.

## A

By its terms, the Fourth Amendment protects the "right of the people to be secure in their *persons*, houses, papers, and effects, against unreasonable searches and *seizures*." *See* U.S. CONST. amend. IV (emphasis added). Accordingly, when a police application of force involves a "seizure" of a "person," we evaluate whether that force was excessive under the Fourth Amendment's "'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989) (citation omitted). In contrast, when presented with a claim of injuries resulting from alleged excessive force applied "outside the context of a seizure," we apply a Fourteenth Amendment substantive due process standard that asks whether the police behavior "shocks the conscience." *County of Sacramento v Lewis*, 523 U.S. 833, 844, 846–47 (1998). Here, we agree with the district court that the PPD's dispersal of class members by the *airborne* transmission of chemical irritants (such as tear gas and pepper spray) and auditory or visual irritants (such as the sound and flash produced by flash-bang grenades) does not constitute a seizure within the meaning of the Fourth Amendment.

"The 'seizure' of a 'person' can take the form of physical force or a show of authority that in some way restrains the liberty of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (simplified). A seizure by show of authority, "such as an order for a suspect to halt," does not constitute a "seizure" within the meaning of the Fourth Amendment

"unless and until the arrestee *complies* with the demand." *Id*. (emphasis added); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991). But a seizure by physical force may occur even "if the force, despite hitting its target, fails to stop the person." *Torres*, 592 U.S. at 311. In reaching this latter conclusion, *Torres* drew on the common law governing "arrests," which constitute the "quintessential[]" "seizure" covered by the Fourth Amendment. *Id*. at 312 (citation omitted). Because, at common law, "an officer's application of physical force to the body of a person *for the purpose of arresting him* was itself an arrest—not an attempted arrest— even if the person did not yield," *id*. at 311 (emphasis altered) (internal quotation marks omitted), the Court concluded that a "seizure" includes a "laying on of hands or application of physical force *to restrain movement*, even when it is ultimately unsuccessful." *Id*. at 312 (emphasis added) (citation omitted). Accordingly, the Court held that "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id*. at 325.

The Court in *Torres* underscored the importance of the common law's intent-to-restrain requirement to any finding of a "seizure" based on the "application of physical force to the body of a person." 592 U.S. at 325; *see also id*. at 317 ("A seizure requires the use of force *with intent to restrain*."). That critical element prevents the "common law rule" from "transform[ing] every physical contact between a government employee and a member of the public into a Fourth Amendment seizure." *Id*. at 317. The Court further explained that, with respect to this element, "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for [the courts] rarely probe the subjective motivations of police officers in the Fourth

Amendment context." *Id*. And just as an officer's purely subjective intent is not relevant, so too the inquiry does not "depend on the subjective perceptions of the seized person." *Id*.

Plaintiffs do not contend that they were seized by a "show of authority" to which they submitted, but only that they were seized by an application of physical force with an objective intent to restrain. We will assume, without deciding, that the diffuse airborne transmission of chemical irritants or intense flashes or sounds at a group of persons may constitute an "application of physical force to the body of [those] person[s]." *Torres*, 592 U.S. at 311; *cf. Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1129–30 (9th Cir. 2002) (holding that the direct application of pepper spray to the eyes of protesters using a Q-tip was an application of force for Fourth Amendment purposes); *Edrei v. Maguire*, 892 F.3d 525, 543 (2d Cir. 2018) (holding that deliberate use of sounds loud enough to cause physical injury constitutes an application of force for Fourth Amendment purposes). But even on that assumption, Defendants' use of such irritants to *disperse* the crowd from the Free Speech Zone does not constitute a seizure because there is no basis in the record for concluding that it was undertaken with the necessary objective intent to *restrain*. *See Torres*, 592 U.S. at 317–18.

*Torres* makes clear that an objective intent to "restrain," for Fourth Amendment purposes, refers to measures that objectively aim to *detain* or *confine* the person, even if only temporarily or even if only through a "mere touch." 592 U.S. at 317–18; *see also id*. at 318 ("[B]rief seizures are seizures all the same."). In deriving the contours of its understanding of a "seizure," *Torres* relied on two common law analogies—namely, the common law governing

"arrests" (for seizures with probable cause) and the common law of "false imprisonment" (for seizures without probable cause). *Id*. at 311, 320. As the Court noted, "[t]he point of an arrest" is "to *take custody* of a person to secure his appearance at a proceeding." *Id*. at 319 (emphasis added). Likewise, "[t]he tort of false imprisonment"—which the Court agreed was "the closest analogy to an arrest without probable cause"—"required '*confinement*,' such as 'taking a person into *custody* under an asserted legal authority.'" *Id*. (emphasis added) (simplified) (quoting RESTATEMENT OF TORTS §§ 35, 41 (1934)). Because an objective intent to assert custody over a person, or to confine the person, was required for any form of "arrest," the requisite intent to restrain is present only when the force applied objectively aims at detaining or confining the person. It follows that an application of force with an objective intent merely to *disperse* or *exclude* persons from an area—and *without* any measures objectively aimed at detaining or confining them in the process—does not involve the necessary "intent to *restrain*" that might give rise to a "seizure."

The correctness of this conclusion is confirmed by considering what a contrary conclusion would mean with respect to the other form of "seizure" covered by the Fourth Amendment (and not at issue in this case). As noted earlier, the Court in *Torres* confirmed that a "'seizure' of a 'person' can take the form of physical force *or a show of authority that in some way restrains* the liberty of the person." *Torres*, 592 U.S. at 311 (emphasis added) (simplified). However, a "show of authority that in some way restrains" a person does not become a seizure "unless and until the [person] *complies* with the demand." *Id*. (emphasis added). If a mere objective intent to disperse suffices to constitute an intent to "restrain," that would mean that a simple instruction to leave an area or

certain premises would constitute a "seizure" if it is obeyed. And that would mean, for example, that a public librarian who merely instructs all the patrons to leave at closing time has "seized" all of those who comply. We are aware of no support for such an extravagant proposition. On the contrary, the common law consistently treated orders of "exclusion" from a place as *not* satisfying the "confinement" requirement of the tort of false imprisonment. *See* RESTATEMENT OF TORTS § 36 cmt. b (1934) ("[If] A wrongfully prevents B from entering the United States[,] A has not confined B, although B, in a sense, may be said to be confined within the residue of the habitable world"); *see also* RESTATEMENT (THIRD) OF TORTS: INTEN. TORTS TO PERSONS § 8, Reporter's Note on cmt. b (Tentative Draft No. 3, 2018) (stating that "exclusion from a place, even if wrongful, does not ordinarily constitute confinement").

We hasten to add that the analysis would be different if, in the course of accomplishing such an intended dispersal or exclusion, a person uses measures that objectively aim to detain or confine another person. Thus, for example, the public librarian who, in order to accomplish the dispersal or exclusion of patrons who ignore a closing-time instruction to leave, grabs them and then pushes or throws them out has effectuated a "seizure." The same would be true if the librarian pressed the shoulder of overstaying patrons and physically escorted them to the door. In both instances, a seizure has occurred because the librarian has used measures that objectively detained or confined the patrons' movement—even if only temporarily—so that, under the librarian's control, the patrons will be moved out the door. The fact that the librarian's ultimate objective was to exclude the patrons from the premises is not normally enough, by

itself, to constitute an objective intent to restrain that gives rise to a seizure.

With these principles in mind, we conclude that Plaintiffs failed to produce sufficient evidence to establish that, in the course of attempting to disperse and exclude class members from the Free Speech Zone, the Defendant officers' application of force through the use of various diffusely-applied airborne irritants involved measures that objectively aimed at *detaining* or *confining* them, even temporarily. As we have noted, and as the district court emphasized, the district court did *not* certify a class with respect to Plaintiffs' claims that some persons were directly physically impacted by *projectiles*, such as the physical pepper balls. And the district court certified a class of persons dispersed by exposure to chemical irritants only because it concluded that "the very nature of the use of gas is that it is *not* contained to a certain individual or a small area" (emphasis added). Thus, in evaluating the *class's* excessive-force claims, we set aside any individualized physical impacts to individual class members by projectiles and focus only upon the class members' generalized exposure to chemical irritants that were objectively aimed at moving them out of the area. But Plaintiffs have produced no evidence that the chemical deployments at issue here were undertaken with an objective intent to restrain, such as, for example, by targeting an immobilizing level of force at selected individuals. They also do not show that the deployments somehow resulted in any submission to the officers' show of force, which arguably would have constituted a seizure from a show of authority. *See Torres*, 592 U.S. at 311 ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." (simplified)). On the contrary, Plaintiffs

expressly conceded in their opening brief that the deployments at issue here "quickly dispersed all protesters from the crowded Free-Speech Zone." On this record, the only reasonable conclusion is that the dispersal of the class members was accomplished *without* measures objectively aimed at detaining or confining them. There was thus no objective intent to restrain and no seizure for Fourth Amendment purposes.

In nonetheless arguing that the Defendant officers here effectuated a seizure, Plaintiffs rely on a variety of clearly distinguishable cases, all of which involved scenarios where the defendant officers *did* detain or confine persons, even if only briefly, or applied force objectively aimed at restraint or confinement in the course of attempting to disperse them. *Cf. Torres*, 592 U.S. at 323 (noting that a seizure can occur even if the arrestee is "never actually brought within the physical control of the party making an arrest" (citation omitted)); *id*. ("[A] seizure is a single act, and not a continuous fact." (simplified)). For example, in *Headwaters*, the officers repeatedly, directly, and individually applied pepper spray with a Q-tip to the eyes of a set of protesters who had linked themselves together using "black bears," *i.e.*, metal devices that shielded the protesters' arms from being separated unless the protesters affirmatively unlocked the devices from the inside. 276 F.3d at 1127–29. The aim was to cause irritation that was so intolerable that the protesters would voluntarily release themselves from the black bears, which some of them did. *Id*. In addressing the protesters' excessive-force claims, we considered whether the officers' use of pepper spray constituted excessive force "to effect an *arrest*." *Id*. at 1130 (emphasis added). We also emphasized that, at the time that the officers applied the pepper spray, they already "had

control over the protesters," who were guarded over by the officers.  *Id*.  A situation, such as *Headwaters*, in which persons are already being detained under the control of officers, and for the objective purpose of effectuating their arrest, is obviously a "seizure" under *Torres*.  Nothing comparable is presented with respect to the claims of the class members here.

Likewise, in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), campus police officers attempting to clear partygoers out of an apartment complex launched pepperballs directly at a particular group of students, and one of the pepperballs "struck Nelson in the eye," causing him to "immediately collapse[] on the ground and f[a]ll into the bushes where he writhed in pain for ten to fifteen minutes." *Id*. at 874.  Nelson suffered permanent eye injuries requiring "multiple surgeries."  *Id*.  In rejecting the officers' argument that there was no seizure because they had not subjectively intended to hit Nelson, we concluded that there was a seizure because "[t]heir conduct was intentional, it was aimed towards Nelson and his group, and it resulted in the application of physical force to Nelson's person as well as the termination of his movement."  *Id*. at 877; *see also Sanderlin v. Dwyer*, 116 F.4th 905, 917 n.2 (9th Cir. 2024) (observing that the officers in *Nelson* "objectively manifested an intent to restrain by firing projectile pepperballs into the crowd, knowing there was a significantly high risk that one such projectile could strike and incapacitate a member of the group").  The airborne dissemination of irritants in this case, by contrast, involves no such measures that were *objectively* aimed at restraining the class members or that actually succeeded in the "termination of [their] movement." *Nelson*, 685 F.3d at 877; *cf. Sanderlin*, 116 F.4th at 913 (finding an objective intent to

restrain when the type of force applied was "chiefly designed, intended, and used for the purpose of incapacitat[ion]," and the force was indisputably "an act that meaningfully interfere[d]" with the targets' "freedom of movement" (simplified)).

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018), is similarly distinguishable. In *Felarca*, the protesters engaged in apparent misdemeanor violations when they "link[ed] arms with other students" in order to block officers from taking down tents that had been illegally set up on campus grounds. *Id*. at 816, 818. But the officers did not use force that was objectively *merely* aimed at dispersal. Rather, they sought to accomplish the dispersal by the use of direct force that objectively aimed at momentarily detaining the plaintiffs within the officers' control—specifically, the officers physically struck or jabbed the plaintiffs with batons and knocked one of them to the ground. *Id*. at 816. That sort of conduct, which involves force objectively aimed at the temporary restraint of the person, is more akin to our earlier example of the librarian who accomplishes a dispersal by throwing a patron out bodily or physically escorting them out. Again, nothing comparable has been shown with respect to the class claims in this case.[6] *Cf. Torres* 592 U.S. at 317 ("While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain.").

---

[6] Likewise unavailing is Plaintiffs' reliance on *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005). There, the officer first seized the plaintiffs by stopping them on their bicycles by "flash[ing] his overhead lights," and he then ordered and "escorted" them in crossing the street. *Id*. at 833–34. This case does not involve any such directed and specific control over a person's movements following an initial conceded seizure.

Because the record shows that the Defendant officers' use of airborne irritants here was not objectively aimed at restraining the class members, even temporarily, there was no "seizure" of the class members within the meaning of the Fourth Amendment.

**B**

Having found that the class's excessive-force claims arose "outside the context of a seizure," we evaluate those claims under the Fourteenth Amendment "shocks-the-conscience test." *County of Sacramento*, 523 U.S. at 844, 854.

We have used "two tests" to determine "whether officers' conduct 'shocks the conscience,'" and "[w]hich test applies turns on whether the officers had time to deliberate their conduct." *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022). Where "the situation at issue evolved in a time frame that permits the officer to deliberate before acting," then an officer's use of force will be found to "shock[] the conscience" if the officer acted with "deliberate indifference" toward any resulting harm. *Id*. (simplified); *see also County of Sacramento*, 523 U.S. at 849–53. If, on the other hand, "the situation at issue escalated so quickly that the officer had to make a snap judgment," then the officer's use of force "shocks the conscience" only if the officer acted with "a purpose to harm [the plaintiff] for reasons unrelated to legitimate law enforcement objectives." *Ochoa*, 26 F.4th at 1056 (simplified); *see also County of Sacramento*, 523 U.S. at 852–54.

We have stated that the word "deliberation," for these purposes, should not be interpreted in a "narrow, technical sense." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Though a police officer may *literally* have "time to

deliberate" while, *e.g.*, chasing a suspect, we nevertheless apply the "purpose to harm" standard whenever the circumstances "force the officers to act quickly." *Id*. In other words, "actual deliberation is *practical*" only when officials have "time to make unhurried judgments, [with] the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *County of Sacramento*, 523 U.S. at 851, 853 (emphasis added). Thus, for example, we have applied the "purpose to harm" standard in cases involving the active use of force during "sudden police chases" or "prison riot[s]," where officers "have obligations that tend to tug against each other," which they must balance "in haste, under pressure, and frequently without the luxury of a second chance." *Id*. at 853 (citation omitted); *see also Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008) ("[W]hen an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply.").

We conclude that the situation in this case is one that escalated quickly, requiring officers to respond promptly without "the luxury . . . of having time to make unhurried judgments." *County of Sacramento*, 523 U.S. at 853; *Sanderlin*, 116 F.4th at 914 (finding that "officers obviously have a legitimate safety interest in controlling a mass of people" and that such circumstances can force "split-second judgments" (simplified)). It is therefore governed by the "purpose to harm" standard. Although the situation in the Free Speech Zone may not have risen to the level of an actual "riot," *see County of Sacramento*, 523 U.S. at 852–53 (referring to a "prison riot" as an archetypal situation in which "a much higher standard of fault than deliberate indifference has to be shown for officer liability"), it presented significant public safety concerns that warranted

prompt action.  It is undisputed that the decision to disperse the crowd in this case was made over the course of three minutes between 8:34 and 8:36 PM, after members of the crowd had thrown at officers both a canister emitting an unknown gas and a pyrotechnic device.  Moreover, in the minutes immediately preceding this decision, the crowd had become increasingly unruly, with suspected Antifa members attempting to breach the fence separating the Free Speech Zone from the Public Safety Zone.  Persons in the crowd were also throwing objects with increasing frequency, despite PPD's more targeted deployment of pepper balls to deter such behavior.  On top of that, these events occurred contemporaneously with the President of the United States departing the immediate vicinity.  We conclude that, based on the undisputed facts, the rapidly deteriorating situation had evolved into one requiring quick judgments under pressure, and that the "purpose to harm" standard therefore governs.

Applying that standard, we conclude that there is no triable issue of any such purpose to harm here.  Plaintiffs point to "nothing in the record suggesting that the officers had an improper purpose to harm" at the time they decided to employ chemical irritants and flash-bang grenades to disperse the crowd.  *See Ochoa*, 26 F.4th at 1058.  The level of force here is not so gratuitous as to give rise to a reasonable inference that it was applied for the purpose of inflicting harm rather than for the "legitimate law enforcement objectives" of "self-protection, and protection of the public."  *Id*. at 1056 (citations omitted).  Any such inference is all the more unreasonable given the undisputed record evidence about the officers' overall restrained management of the protest prior to the decision to clear the Free Speech Zone.  Plaintiffs argue that a contrary inference

is nonetheless warranted in light of the fact that, sometime after the protest, an unknown person arranged for the creation of a commemorative coin that mockingly displayed a protester being hit by a munition, and several PPD officers possessed or distributed the coins. But such later-occurring events, even if distasteful, have "minimal relevance" because they "took place after the officers" applied the force in question. *Id*. at 1058 (reaching a similar conclusion about officers' alleged "cheering and laughing," after the fact, about their use of force).

Because the Fourteenth Amendment's "purpose to harm" standard (rather than the Fourth Amendment's reasonableness standard) governs the Defendant officers' use of chemical irritants and flash-bangs against the class members, and because there is no triable issue of such a purpose to harm, the district court correctly granted summary judgment against the class on its claims of excessive force in violation of the Fourth and Fourteenth Amendments.

## III

We turn next to the individual excessive-force claims asserted by Plaintiffs Yedlin, Travis, and Guillen.

These claims are presented to us in the context of the individual Defendants' interlocutory appeal of the denial of qualified immunity to them on these claims. "Our de novo review of a grant [or denial] of summary judgment based on qualified immunity involves two distinct steps." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014). Specifically, government officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District*

*of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation omitted). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "We may address these two prongs in either order." *Sandoval*, 756 F.3d at 1160 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

To the extent that these Plaintiffs' individual excessive-force claims overlap with the class's claims, our earlier analysis governs as well, and those claims fail at the first prong of the qualified immunity analysis. However, each of these three Plaintiffs' situations differs from the class claims in that each of them individually experienced a direct physical impact from a munition fired by a PPD officer. Our earlier analysis finding no "seizure" with respect to the class claims therefore does not carry over to these Plaintiffs' individual claims based on such physical impacts. However, we need not resolve whether these individual Plaintiffs experienced a temporary "seizure" when they were directly impacted by physical objects that were potentially momentarily disabling. *See Nelson*, 685 F.3d at 877. Even assuming that they were, we conclude that, based on the undisputed facts, the Defendant officers were entitled to qualified immunity because they acted reasonably under the circumstances or violated no clearly established law.

## A

We first address Yedlin's individual excessive-force claim.

As noted earlier, around 8:32 PM on August 22, 2017, members of the crowd began aggressively pushing the fence

separating the Free Speech Zone from the Public Safety Zone in an apparent attempt to breach it. Plaintiff Ira Yedlin was among the members of the crowd shaking the fence. Defendant Moore ordered Defendant officers to fire pepper balls at the ground directly in front of the group, which caused the group to back away. Grenadiers fired additional pepper balls at individuals who did not disperse. Yedlin, who had initially retreated after the first volley, resumed shaking the fence within 11 seconds of his retreat, and at that point he was struck several times by pepper balls—in the face, lower back, and in three places on the legs.

"[W]hether an officer has used excessive force" in violation of the Fourth Amendment's objective reasonableness standard "'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (quoting *Graham*, 490 U.S. at 396). We also consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Felarca*, 891 F.3d at 817. Whether there is an immediate threat to physical safety is generally the most important consideration. *Young v. County of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The reasonableness analysis must further "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

particular situation." *Id*. at 396–97. We have emphasized that the "ultimate inquiry" always remains "whether the totality of the circumstances justifies a particular sort of seizure." *Young*, 655 F.3d at 1163 (simplified).

We have previously described as "significant" the *risk* of physical harm from the physical impact of pepper balls. *Nelson*, 685 F.3d at 879. In *Nelson*, the "actual harm caused" was also quite serious, because Nelson was "rendered immobile," experienced "temporary blindness," suffered "permanent loss of visual acuity," and was "forced to endure multiple surgeries." *Id*. at 875, 879. Yedlin's actual injuries, which consisted predominantly of bruising, were not as serious as those in *Nelson*. Accordingly, the district court properly characterized the resulting physical force used against Yedlin as "intermediate."

Defendants do not contend that Yedlin was committing a crime at the time he was struck by the pepper balls, and the record does not disclose that there was any attempt to actually arrest Yedlin or that he resisted any such arrest. As a result, this is not a situation in which the use of force can be justified by either the "severity of the crime at issue" or the need to overcome resistance to arrest. *Graham*, 490 U.S. at 396. Rather, Defendants' asserted justification for the particular deployment of force that struck Yedlin was "the severity of the security problem at issue," *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), and the immediate threat that Yedlin's actions created in that regard. The PPD had a very significant interest in avoiding any breach of the security fence separating the Free Speech Zone from the Public Safety Zone, because that would present an immediate and substantial threat to the safety of the officers, nearby members of the public, and potentially even the President's motorcade. By returning and vigorously shaking

the fence just seconds after the PPD had repelled an apparent attempt to breach it, Yedlin posed an immediate threat to the PPD's ability to maintain this boundary. *Cf. Nelson*, 685 F.3d at 880–81 (noting that police officers faced no immediate security concerns at the time they fired pepper balls at Nelson). Moreover, although no verbal warnings were given, *see Felarca*, 891 F.3d at 817, that carries little weight here given that Yedlin *returned* to the fence after a prior round of pepper balls had just been fired to the ground to prevent what the officers reasonably perceived to be an attempt by suspected Antifa members to breach the fence. Yedlin was thereby actually on notice of such a potential use of force even without verbal warnings.

Examining the totality of the circumstances, we conclude that, as a matter of law, Defendants' use of intermediate force against Yedlin was a reasonable response that was "commensurate[]" to the PPD's strong interest in avoiding any breach of the fence. *Young*, 655 F.3d at 1163; *see also Nelson*, 685 F.3d at 882 ("[O]fficers 'are not required to use the least intrusive degree of force possible'" (citation omitted)). Consequently, Yedlin's Fourth and Fourteenth Amendment rights were not violated. We therefore conclude that the relevant individual Defendants were entitled to qualified immunity on Yedlin's claim and that the district court erred in concluding otherwise.

## B

We next address the individual excessive-force claim asserted by Travis.

After the PPD made several attempts to disperse the crowd and announced an unlawful assembly from a helicopter above the Free Speech Zone, at about 9:02 PM a police vehicle arrived at one corner of the Free Speech Zone

and repeatedly communicated further unlawful assembly announcements. Some individuals remained on Second Street, including Travis. PPD then formed a "skirmish line" and moved north on Second Street, using pepper balls to disperse the remaining individuals, particularly those that PPD officers perceived as aggressive.

Undisputed video evidence and Travis's own testimony show that Travis intentionally approached the moving skirmish line in order to "get a shot of [it]" with her camera. Travis positioned herself "right in front" of the skirmish line, at a distance of "about ten to [fifteen] feet," as it marched forward. The video evidence demonstrates that Travis moved toward the skirmish line even after officers had begun deploying chemical spray at the crowd in her immediate vicinity. After taking her photos, Travis turned and began to slowly walk away from the police line, at which point police fired a weapon toward her at close range, the force of which grazed her shoulder, knocked her sunglasses off of the top of her head, and caused her to fall over. Viewing the record in the light most favorable to Travis, she was targeted with a "muzzle blast"—a burst of chemical powder with irritating properties—as well as pepper spray and an unknown projectile. Travis walked home shortly thereafter, which she was able to do unassisted. Travis was left with a burning sensation in her eyes for roughly fifteen minutes, a temporary cough, and bruising on her backside that caused her to miss a day of work.

We conclude that Defendants' use of force against Travis was objectively reasonable. As with Yedlin, Travis's actual injuries were nowhere near as serious as those in *Nelson*, and we view the force deployed against her as intermediate. *See Nelson*, 685 F.3d at 875, 879. Like Yedlin, Travis was not being arrested and was not resisting arrest. However, unlike

Yedlin's situation, Travis was struck after she remained in the area in clear disregard of the repeated announcement that an unlawful assembly had been declared and after multiple orders to disperse had been issued.  Moreover, Travis chose to place herself directly in front of the advancing skirmish line, and in doing so, she placed herself between the officers and near the remaining crowd behind her, which was continually throwing objects at the officers.  That Travis chose to place herself in that situation does not diminish the PPD's strong interests in addressing the lawlessness behind her, in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order.  Viewing all of the circumstances in context, the repeated applications of force made by the advancing officers, including the particular blast that impacted Travis, were reasonable measures to accomplish the PPD's substantial interests in public safety.  *See Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir. 1994) (noting the distinctive public safety interests involved with responding to organized and concerted lawlessness).

But even if we were to assume that the Defendant officers violated Travis's Fourth Amendment rights, they are nevertheless entitled to qualified immunity because the relevant right asserted by Travis was not clearly established. For a right to have been "clearly established," it must have had a "sufficiently clear foundation" in precedent at the time of the challenged conduct.  *Wesby*, 583 U.S. at 63.  This typically means that then-existing precedent must have "clearly prohibit[ed] the officer's conduct in the particular circumstances before him," *id.*, but general rules may suffice to clearly establish the illegality of an officer's action in an "obvious case," *Kisela*, 584 U.S. at 105 (citation omitted). Here, Plaintiffs do not cite any case that could have "clearly

establish[ed]" that Defendants' use of force against Travis was objectively unreasonable. The closest case is *Nelson*, which similarly dealt with the use of projectile chemical tools against an unruly group. But the defendants in *Nelson* deployed force against a group of college partiers at an apartment complex who had already been effectively confined by police and were peacefully awaiting instructions on how and when they could leave. *See Nelson*, 685 F.3d at 872–74. Furthermore, there was no objective indication of any "threatening or dangerous behavior." *Id*. at 880–81. These differences, among others, make clear that *Nelson* "is materially distinguishable" and thus does not clearly establish the law governing this case. *Rivas-Villegas*, 595 U.S. at 6. And this is plainly not an "obvious" case in which every reasonable officer would have recognized that the Defendant officers' conduct was unlawful.

For these reasons, we conclude that the district court erred in failing to grant summary judgment, on qualified immunity grounds, to the relevant individual Defendants with respect to Travis's excessive-force claims.

## C

We turn next to Guillen's excessive-force claim.

The use of force against Plaintiff Guillen occurred at the intersection of Monroe Street and Third Street—the eastern edge of the Free Speech Zone. At the time, protesters in the area directly across from the Phoenix Convention Center had been dispersed, but many protesters remained in the larger area. Although Defendant Moore had already decided to declare an unlawful assembly at this time, PPD had not yet begun broadcasting that order to the protesters. Prior to escalating their use of force, the PPD officers across from Guillen's section of the Free Speech Zone deployed inert

smoke on the ground in front of the police fence. Guillen expressed confusion over the officers' intention, although her companion stated that he believed the PPD wanted the protesters to "go home." Uncontroverted video evidence shows that, at 8:50 PM, an unidentified object was fired into the crowd of protesters from the direction of the Public Safety Zone. This prompted most of the protesters present at the intersection—including Guillen—to walk northward along Third Street, away from the police fence. She was hit by a projectile of some kind in her stomach and upper hip, causing her to bleed. Video shows that Guillen was able to walk with some assistance from her friend. According to Guillen, this wound caused her severe pain in the immediate aftermath of the protest, as well as for several days afterward. Additionally, Guillen claims that the range of movement in her leg has not fully returned, and that she now requires the use of an inhaler.

Viewing the record in the light most favorable to Guillen, the PPD's use of force against her constituted a seizure, and we conclude that there is a triable issue as to whether that use of force was objectively unreasonable. There are a number of features surrounding the particular use of force that struck Guillen that distinguish it from the uses of force against Yedlin and Travis. In particular, in contrast to Travis's situation, the video evidence does not show any obviously unlawful or threatening conduct occurring in Guillen's immediate vicinity prior to the relevant Defendants' use of force. Nor did Guillen engage in any personal conduct, as Yedlin had done, that itself presented a risk to public safety. Guillen was also not disobeying any orders—at the time, no announcement of an unlawful assembly had been made, and the video evidence indicates that she was confused as to what she was supposed to do.

But in the absence of the sort of factors we noted with respect to Yedlin and Travis, we conclude that, even if Guillen *had* "heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk," would not make reasonable the particular use of chemical projectiles against her, causing the moderately serious injuries she experienced. *See Nelson*, 685 F.3d at 882.

Nonetheless, we conclude that *Nelson* is "materially distinguishable" in several respects and that it therefore did not "clearly establish" that the relevant Defendants' actions violated Guillen's rights. First, *Nelson* emphasized the overall "absence of exigency involved" in the officers' dispersal of the gathering at issue in that case. 685 F.3d at 880. Though the officers in that case "plainly had an interest in clearing [an] apartment complex" of rowdy college partiers once the owner of the complex requested it, we found that "the desire to do so quickly, in the absence of any actual exigency, [could not] legitimize the application of force when it is not otherwise justified." *Id*. Thus, *Nelson* did not involve the larger exigent public safety concerns that are present in the overall context of this case. Second, we emphasized in *Nelson* that Nelson was part of a group of "students gathered with [him] in the breezeway" of the apartment, which was a separate and "very narrow and confined space," and that several of the "defendant officers stated in their depositions that they did not see anyone in Nelson's group throwing bottles or engaging in any other threatening or dangerous behavior." *Id*. at 873, 880. Although there was no apparent misconduct in Guillen's *immediate* area at the time that she was struck, she was not in a discretely separate zone from those down the block in the Free Speech Zone who were still engaged in such acts.

Moreover, the officers were reasonably concerned about the possibility of troublemakers "circulat[ing] anonymously within the larger crowd of protesters." Third, although (like *Nelson*) no verbal order to disperse had been given at that point, there had been (unlike *Nelson*) numerous objective indicia that the police were trying to clear the area.

Because no precedent "'squarely governs' the specific facts at issue" and because this is not an "obvious case," *Kisela*, 584 U.S. at 104–05 (citations omitted), we conclude that the relevant Defendants are entitled to qualified immunity with respect to the force used against Guillen. Accordingly, on that basis, we reverse the district court's denial of summary judgment to the relevant individual Defendants.

## IV

We turn next to the First Amendment claims, which are asserted by all Plaintiffs, on their own behalf and on behalf of the classes.

## A

We have stated that "protests or assemblies cannot be dispersed on the ground that they are unlawful unless they 'are violent or pose a clear and present danger of imminent violence' or they are violating some other law in the process." *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) (citation omitted); *see also id*. (stating that "enjoining or preventing First Amendment activities before demonstrators have acted illegally or before the demonstration poses a clear and present danger is presumptively a First Amendment violation"). Plaintiffs contend that the PPD's dispersal of the class members

violated the First Amendment because, in their view, the requisite "clear and present danger" was not present.

Whether a particular situation presents a clear and present danger of imminent lawlessness must be evaluated under an objective standard, rather than based on the subjective apprehensions of the officers. *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017) (stating that "*[f]ear* of serious injury cannot alone justify suppression of free speech and assembly" and that "there must be reasonable ground to fear that serious evil will result" (emphasis omitted) (citation omitted)).  Moreover, in assessing whether a sufficient clear and present danger justifies dispersal of a crowd, "[i]t is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit." *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 16 (1972)). Accordingly, the question here is whether the conduct of the persons in the Free Speech Zone, taken as a whole, created objectively reasonable grounds to conclude that there was a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940); *see also Grayned*, 408 U.S. at 116 ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment.").

We conclude that, based on the undisputed facts, there were sufficient objectively reasonable grounds to establish the requisite "clear and present danger" of an "immediate threat to public safety, peace, or order."  The decision that the assembly had become unlawful was made by Moore at

some point during the minutes of 8:34 to 8:36 PM, after unknown persons in the crowd had thrown into the Public Safety Zone a canister emitting an unidentified gas as well as a pyrotechnic device.  By that point, the PPD had already repelled, through the use of chemical munitions, one organized attempt to breach the police fence that separated protesters from the Public Safety Zone.  Despite that limited use of force, it is undisputed that the suspected Antifa members who had attempted to breach the Public Safety Zone then proceeded to "circulate anonymously within the larger crowd of protesters," followed by a significant escalation of "objects being thrown from the crowd."  It was only after this escalation occurred and, in particular, after the gas canister and pyrotechnic device were thrown, that the PPD began to disperse the protesters from the Free Speech Zone.  Whatever the outer boundaries of the "clear and present danger" test may be, we think that circumstances involving the use of unidentified gas and pyrotechnic devices by agitators dispersed throughout a crowd, escalating violence toward the officers, an organized attempt to breach a police line, and the exigent concern of presidential security, falls within it.

Accordingly, we hold that Defendants were properly granted summary judgment with respect to Plaintiffs' First Amendment claim that there was an insufficient "clear and present danger" to justify dispersal of the Free Speech Zone. But even if we assumed that there was a triable issue on that score, we conclude that Plaintiffs have failed to identify any precedent that would clearly establish that Defendants violated Plaintiffs' rights in the context that they confronted. *See Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (stating that, for a right to be "clearly established," the "right's contours" must have been "sufficiently definite that

any reasonable official in the defendant's shoes would have understood that he was violating it"). Accordingly, the individual Defendants are also entitled to qualified immunity on this claim.

## B

It is not entirely clear from Plaintiffs' briefs whether Plaintiffs are contending that a First Amendment retaliation claim may properly be asserted in the crowd-dispersal context *in addition to* a clear-and-present-danger claim or only as an *alternative* to it. There are strong arguments that a conventional First Amendment retaliation framework, with its focus on subjective causation, is a poor fit for the crowd-dispersal context, because it adds little to the objective clear-and-present-danger analysis and will often raise "particularly difficult" causation questions. *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (relying upon similar concerns in holding that First Amendment retaliatory arrest claims require a showing of a lack of objective probable cause). But we need not resolve any such issues because, even assuming that conventional First Amendment retaliation principles may also be applied here, we conclude that there is no triable issue that the dispersal of the crowd was undertaken with retaliatory intent.

As the district court correctly concluded, the undisputed facts do not support a reasonable inference of retaliatory intent. The PPD worked in advance to coordinate with protesters in order to ensure that the protests were conducted peacefully, and the protests went on without any serious incident for several hours. When problems then began to arise, the PPD initially responded with more limited measures and only decided to disperse the crowd when the requisite objective clear and present danger had

materialized. On these facts, no reasonable jury could conclude that the dispersal was in fact subjectively motivated by antipathy to Plaintiffs' political speech. Plaintiffs again point to the after-the-fact distribution, among some officers, of a commemorative coin that mockingly displayed a protester being hit in the groin by a munition and that bore the politicized inscription "Making America great again one nut at a time." But such later-occurring conduct by individual officers, even if distasteful or immature, does not provide a sufficient basis for reasonably inferring, in the context of all of the circumstances of this case, that the actions taken in immediate response to a clear and present danger were instead undertaken because of hostility to the protesters' views. *Cf. Ochoa*, 26 F.4th at 1058. We affirm the district court's grant of summary judgment on this claim.

## C

Plaintiffs also argue that their First Amendment rights were violated because Defendants failed to issue a verbal dispersal order before beginning to try to disperse the crowd. We disagree.

Plaintiffs contend that the Second Circuit's decision in *Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006), supports their view that the First Amendment *always* requires a verbal dispersal order. That is wrong. *Jones* held that such a verbal order was required in the context of a "peaceful protest" in which, without warning and in the absence of a clear and present danger, the police "charged into the crowd, arresting protesters indiscriminately." *Id*. at 60 & n.5. Indeed, *Jones* made clear in a footnote that it did not adopt any per se rule. *See id*. at 60 n.5 (stating that the court "ha[s] no occasion to determine whether police would be permitted to disperse

without warning a crowd more akin to a mob than the peaceful protest plaintiffs describe"); *see also Garcia v. Does*, 779 F.3d 84, 94 n.11 (2d Cir. 2015) (rejecting the view that *Jones* establishes a per se rule of advance notice). We reject Plaintiffs' claim that the First Amendment required a verbal dispersal order before officers could begin undertaking measures to clear the Free Speech Zone.[7]

## V

We affirm the district court's summary judgment to Defendant Police Chief Williams. Plaintiffs contend that, as a supervisor, she was liable for the individual officers' violations of their constitutional rights. To establish such liability, Plaintiffs must demonstrate that Williams either "participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them." *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1182 (9th Cir. 2007) (simplified). But there can be no such supervisorial liability in the absence of an underlying constitutional violation. Moreover, we have held that, when the subordinate officers have not been shown to have "violated a clearly established right, it necessarily follows that [their police supervisors] cannot have violated a clearly established right by supervising" those officers. *Felarca*, 891 F.3d at 823. Because we have concluded that all of Plaintiffs' claims either fail or did not involve the violation

---

[7] We express no view as to whether other provisions of the Constitution might require advance notice before undertaking steps such as, for example, individual arrests for failing to disperse. *Cf. Barham v. Ramsey*, 434 F.3d 565, 575–76 (D.C. Cir. 2006) (stating that the "Fourth Amendment" requires that, in clearing an "unruly demonstration," officers must "invok[e] a valid legal mechanism for clearing the area and then provid[e] an opportunity for affected persons to follow an order to disperse").

of a clearly established right, Plaintiffs' claims of supervisorial liability necessarily fail. On that basis, we affirm the district court's grant of summary judgment to Williams.**[8]**

## VI

Lastly, we address Plaintiffs' claims of municipal liability against the City of Phoenix under 42 U.S.C. § 1983.

A municipality "may be liable in a §1983 action . . . when the plaintiff proves that the municipality caused the plaintiff's injury." *Barone v. City of Springfield, Oregon*, 902 F.3d 1091, 1106–07 (9th Cir. 2018) (citing *Monell*, 436 U.S. at 691). Municipal liability will not result from every wrongful act committed by an employee, but only those which occur pursuant to "official policy . . . for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (simplified). "Official policy" includes "decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). A municipality may also be liable for "decision[s] not to train certain employees about their legal duty to avoid violating citizens' rights," but such liability arises only where the failure to train "amounts to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id*. (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)) (simplified).

On appeal, Plaintiffs rely on two theories of municipal liability: (1) a final policymaker caused the allegedly

---

[8] For the same reason, the district court erred in holding that Moore and McBride could be held liable under a supervisorial liability theory. *See supra* note 4.

unconstitutional acts, and (2) the city's failure to train its officers amounted to "deliberate indifference." Viewing the record in the light most favorable to Plaintiffs, we agree with the district court that there is no genuine issue of material fact that could support either of these arguments.

## A

A municipality may be liable for constitutional violations if the municipal employee who caused the plaintiff's constitutional injury is an official with "final policymaking authority." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). Plaintiffs argue that the district court erred when it determined that the City Council and City Manager—but *not* Defendant Chief Williams—were the relevant final policymakers for the City of Phoenix. We need not resolve this issue. As explained above, Plaintiffs have raised a triable issue as to only one constitutional violation—namely, the individual excessive-force claim asserted by Guillen. Even assuming that Chief Williams had final policymaking authority, Plaintiffs have failed to raise a triable issue that Chief Williams *caused or ratified* the use of excessive force against Guillen. *See Chudacoff v. University Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1151 (9th Cir. 2011) (stating that, to establish *Monell* liability based on the actions of "an individual with 'final policymaking authority,'" the plaintiff must show that the constitutional "injury was caused or ratified" by that person (citation omitted)).

In arguing that Chief Williams's conduct suffices to establish municipal liability, Plaintiffs emphasize that she "was the final policymaker for law-enforcement matters related to President Trump's rally" and that she oversaw the preparations for the event and "personally briefed the TRU

squad before they went out." But these contentions, at best, are directed at Chief Williams's asserted role in the *overall* preparation for, and management of, the event. These points might conceivably have had some persuasive force if we had found triable violations of the *class members'* constitutional rights in the course of the event, but we have rejected all of the classes' claims on the merits. What we have found, instead, is a single specific use of force against Guillen that, under the distinctive circumstances of her situation, a reasonable jury could find to be excessive. Even assuming *arguendo* that Chief Williams established municipal policy for the overall management of the event, Plaintiffs have proffered no evidence that Chief Williams caused the situation-specific use of excessive force against Guillen. *See Board of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (stating that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality" and that "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged" and that this requires a showing of "the requisite degree of culpability" as well as "a direct causal link between the municipal action and the deprivation of federal rights").[9]

Plaintiffs alternatively argue that Chief Williams subsequently "ratified PPD's conduct" in her "post-rally

---

[9] We reject Plaintiffs' argument that municipal liability here can rest on the theory that Chief Williams delegated her asserted final policymaking authority to Moore, who then caused the use of excessive force against Guillen. At most, Plaintiffs have established that Moore exercised discretion to act in the field pursuant to municipal policies established by others, which we have held is *not* sufficient to establish a delegation of municipal policymaking authority for purposes of municipal liability under § 1983. *See Christie v. Iopa*, 176 F.3d 1231, 1236–37 (9th Cir. 1999); *Tevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996).

public statements." "To show ratification, a plaintiff must show that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004) (citation omitted). Here, Plaintiffs have failed to present sufficient evidence that Chief Williams knew and approved of the particular use of force against Guillen, much less that she endorsed the "basis for it." *Id*. Plaintiffs have instead presented evidence that Chief Williams arguably ratified the overall management of the event, which we have held has not been shown to have been constitutionally deficient.

## B

As to Plaintiffs' "failure to train" theory, Plaintiffs failed to present sufficient evidence to allow a reasonable trier of fact to find that the City of Phoenix was "deliberately indifferent" to Plaintiffs' constitutional rights.

A municipality incurs liability for a failure to train when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. "Deliberate indifference" is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting *Board of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997)). To succeed on a "failure to train" theory of *Monell* liability, it is thus "ordinarily necessary" for a plaintiff to demonstrate "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. However, the Court has left open the

possibility that "a single violation of federal rights, accompanied by a showing that the municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Brown*, 520 U.S. at 409.

Plaintiffs base their "failure to train" argument on the assertion that, although the City of Phoenix extensively trains PPD officers "on *how* to use" chemical agents to disperse protesters, it failed to properly teach them "*whether* or *when*" to do so. As previously discussed, we have found no triable issue as to whether Defendants committed a constitutional violation in most claims in this case, but we disposed of Guillen's excessive-force claim solely based on the "clearly established" prong of qualified immunity. Given that there therefore is a triable issue *only* as to whether Defendants caused Guillen to suffer a constitutional injury, Plaintiffs' "failure to train" claim rests on showing that Guillen's injury *in particular* was the obvious result of the allegedly inadequate training. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012). But Plaintiffs have failed to show that her constitutional injury was such an obvious consequence that PPD's failure to more thoroughly train its officers on the use of chemical agents amounted to "deliberate indifference" toward her rights.

Plaintiffs do not provide any basis to dispute the record evidence showing that the PPD *did* train its officers about "whether or when" to deploy chemical agents. The record, including portions cited by Plaintiffs, show that PPD officers received training on the responsibility to protect protesters' "constitutional rights to assemble and exercise free speech" and were told that chemical agents should only be deployed when "absolutely necessary" and "other passive means have failed to restore order." Furthermore, the record

demonstrates that the PPD instructed its commanders to issue dispersal warnings to the crowd "with significant amplification and repetition as necessary to be heard by the entire crowd" "if time and circumstances permit," prior to the deployment of chemical agents. The PPD's training materials describe even the indirect use of pepper balls in particular as justified only "[t]o prevent the possibility of injury to an officer or another person," or to "subdue a person who is threatening or attempting physical harm to self or another, resisting arrest, RIOTING, or interfering with an arrest."

Rather than cite any "instance[] of similar unlawful conduct" prior to the protest—let alone a pattern—that might provide the City with notice that its existing training program was inadequate, Plaintiffs instead assert that this case presents the "rare" fact pattern in which evidence of a single violation is enough to establish *Monell* liability under a "failure to train" theory. *See Connick*, 563 U.S. at 64. But the record indicates that, despite deploying at numerous protests every year, Grenadiers rarely resort to using chemical agents. Plaintiffs do not explain how Guillen's alleged constitutional injury in this case is an "obvious consequence" of PPD's current training regimen when the record indicates that PPD officers almost never deploy chemical agents, let alone illegally. *Cf. Connick*, 563 U.S. at 63–64 (stating that, in "the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force," such a failure to train "could reflect the city's deliberate indifference" to constitutional violations, "[g]iven the known frequency with which police attempt to arrest fleeing felons and the 'predictability that an

officer lacking specific tools to handle that situation will violate citizens' rights'" (citation omitted)).  We therefore determine that the district court was correct that Plaintiffs failed to raise a material factual dispute regarding a "failure to train" for purposes of *Monell*.

*      *      *

We therefore affirm the district court's dismissal of Plaintiffs' claims against Defendant City of Phoenix.

## VII

We reverse the district court's denial of summary judgment to the relevant individual Defendants on Plaintiffs Yedlin, Travis, and Guillen's excessive-force claims and hold that these individual Defendants are entitled to qualified immunity.  We affirm the district court's grant of summary judgment to Defendants on all remaining claims.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**